**CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INC., et al., Plaintiffs,**

v.

**Edwin HARPER, et al., Defendants.**

**Civ. A. No. 82–2899–C.**

United States District Court, D. Massachusetts.

May 29, 1984.

Conservation Law Foundation of New England, Inc., Peter Shelley, Boston, Mass., for plaintiffs.

Patti Saris and Paul Johnson, Asst. U.S. Attys., Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action in which plaintiffs seek declaratory and injunctive relief for alleged violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), and of various other federal statutes. Plaintiffs invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1361 and 2201. The case is now before the Court on defendants' motion to dismiss.

For purposes of a motion to dismiss, all averments of the plaintiffs' complaint are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); *O'Brien v. DiGrazia,* 544 F.2d 543, 545 (1st Cir.1976), *cert. denied sub nom. O'Brien v. Jordan,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). A court should not allow a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

Plaintiffs are numerous conservation and environmental organizations including, among others, the Conservation Law Foundation of New England, Inc., Save the Bay, and the National Resources Defense Council, Inc. The complaint states that members of the plaintiff groups use the lands allegedly affected by defendants' activities for environmental, conservation and aesthetic activities.

Defendants include Edwin Harper, Gerald Carmen, Edwin Meese, James Baker, David Stockman, William Clark, Martin Feldstein, and Bruce Selfon, in their official capacities as members of the Property Review Board (PRB). President Reagan created the PRB by Executive Order No. 12348, 47 Fed.Reg. 8547 (1982), "in order to improve management of Federal real property." The PRB is empowered among other things to "develop and review Federal real property acquisition, utilization, and disposal policies with respect to their relationship to other Federal policies"; to advise the Administrator of General Services with regard to identifying and promptly disposing of non-essential real property holdings; and to "establish for each Executive agency annually the target amount of its real property holdings to be identified as excess." *Id.*

Other defendants are James Watt, Secretary of the Department of Interior; John Block, Secretary of the Department of Agriculture; Robert Burford, Director of the Bureau of Land Management; Max Paterson, Chief of the United States Forest Service; and Donald Regan, Secretary of the Treasury Department.

Plaintiffs claim that defendants have developed a "comprehensive new program administered by the Property Review Board and carried out by the other defendants" to change dramatically the federal government's disposal of public property. They allege that the PRB and other defendants "have begun to carry out their new duties and implement [a] massive new program of land sales."

Under this "program," the PRB would direct a concerted effort to improve Federal asset management and to dispose of unneeded Federal property. The program allegedly calls for discontinuance of free land transfers to Federal agencies and the "phasing out" of discounted and no-cost conveyances to state and local governments. It allegedly requires that conveyances to state and local governments be made "as a rule ... only at fair market value," with limited exceptions. Excess properties will be offered for sale first to state and local governments. If state and local governments are unwilling to pay fair market value, the properties will be offered for sale to the general public. Proceeds from such sales would be used "to begin retiring the national debt."

Plaintiffs allege that defendants expect the program to generate receipts of $1.3 billion in fiscal year 1983, and over $4.25 billion in fiscal years 1984–1987. Plaintiffs allege that, by comparison, GSA receipts from sales of surplus real property amounted to approximately $60 million a

year prior to implementation of the program.

The complaint alleges that defendants have never held an administrative public hearing, or a public rulemaking proceeding, nor have they undertaken any "evaluation of the vast environmental consequences of this new program." Plaintiffs allege that, despite this, defendants have begun to implement the program by identifying and selling large amounts of federal property.

NEPA

In Count I, plaintiffs allege that defendants have failed to prepare "an adequate environmental assessment [or] any other document analyzing the environmental effects of their program as required by NEPA and its implementing regulations."

■ Defendants challenge plaintiffs' standing to sue under NEPA. To establish standing plaintiffs must allege that the challenged activity will cause them "injury in fact," that the injury "fairly can be traced to the challenged action," and that the injury is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.* ("*Valley Forge*"), 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The alleged injury must also be to an interest arguably within the zone of interests to be protected by NEPA. *Id.* at 475, 102 S.Ct. at 760. Moreover, plaintiffs' mere "organizational interest" in the environment is not sufficient to establish standing. *Sierra Club v. Morton*, 405 U.S. 727, 738–40, 92 S.Ct. 1361, 1367–68, 31 L.Ed.2d 636 (1972). Plaintiffs must show that they personally have suffered actual or threatened injury from defendants' allegedly illegal activity. *Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759.

■ NEPA is designed to force decision-makers to consider the environmental effects of their activities and to weigh them against the benefits of their actions. It operates directly "to influence the decision-making process." *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir.1983). Accordingly, "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Id.*

■ Plaintiffs in this case allege that their members use public lands for recreational activities and aesthetic enjoyment. They allege that defendants will sell or cause the sale of those public lands without observing NEPA's procedural requirements. They claim that sales of those lands will reduce the amount of public land available for their recreational and aesthetic enjoyment, and will adversely affect their continued use of the land. I rule that those allegations are sufficient to establish an "injury in fact." Moreover, I rule that plaintiffs' recreational use and aesthetic enjoyment of the land fall within the zone of interests to be protected by NEPA. The statute itself states that it is the responsibility of the federal government "to use all practicable means, ... [to] assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings [and to] attain the widest range of beneficial uses of the environment...." 42 U.S.C. § 4331(b)(2), (3). Finally, an order of this Court enjoining defendants to comply with NEPA procedures would provide a complete remedy for plaintiffs' alleged injury. For those reasons, I rule that plaintiffs have standing to assert claims under NEPA.

NEPA requires "all agencies of the Federal Government" to prepare a detailed statement regarding the environmental impact of any proposal for "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2). Defendants argue that the PRB is not an "agency" subject to the requirements of NEPA.

■ Because the statute does not define the term "agency," courts have looked for guidance to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq. See Commonwealth of Puerto Rico v. Muskie*, 507 F.Supp. 1035, 1057 (D.P.R.1981) *vacat-*

ed on other grounds, 668 F.2d 611 (1st Cir.1981). The APA defines an "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1). The Court of Appeals for the District of Columbia has ruled that the "APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C.Cir. 1971). Judge McGowan of that Court wrote in *Washington Research Project, Inc. v. HEW*, 504 F.2d 238, 248 (D.C.Cir.), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1974), that "[t]he important consideration is whether [the governmental unit] has any authority in law to make decisions." A court should inquire, therefore, whether the governmental unit has substantial authority to act with the sanction of the government behind it. *See generally Lee Construction Co., Inc. v. Federal Reserve Bank of Richmond*, 558 F.Supp. 165, 172–76 (D.Md.1982).

■ Whether the PRB in fact has sufficient authority to constitute it an agency under NEPA is a question of fact to be answered by examining the PRB in its particular governmental context. *Washington Research Project, Inc. v. HEW*, 504 F.2d at 246–47. Plaintiffs have alleged facts tending to show that the PRB possesses broad power, whether formal or informal, to control the sale or other disposition of public property. I rule that, for the purposes of this motion, those allegations are sufficient to bring the PRB within the scope of NEPA.

■ Plaintiffs allege that defendants' program constitutes a "major Federal action" under NEPA. Regulations promulgated by the Council on Environmental Quality ("CEQ") define "major Federal action" to include the "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18 (1983). CEQ regulations are entitled to substantial deference. *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). There is little doubt that, on the facts alleged in the complaint, defendants' program constitutes a major federal action. The question remains, however, whether defendants are required by NEPA to prepare a "programmatic" EIS covering the entire program.

■ A programmatic EIS addresses the broad environmental consequences likely to arise from a wide-ranging federal program.

[I]f the "major Federal action" at issue consists of a number of related enterprises associated within a single program and planned together, then their joint effects should probably also be considered together. This proceeds from the requirement that the scope of the federal action be accurately characterized to ensure that an EIS of equivalent scope is prepared.

*National Wildlife Federation v. Appalachian Reg. Comm'n.*, 677 F.2d 883, 888 (D.C.Cir.1981).

■ The scope of an EIS and the "corollary decision whether to prepare a programmatic EIS at all are matters initially committed to agency discretion." *Id.* at 888. When an agency decides whether to prepare a programmatic EIS, or what geographical regions the EIS should cover, the agency may consider numerous factors, including the feasibility of such a wide-ranging impact study. *Kleppe v. Sierra Club*, 427 U.S. 390, 414, 96 S.Ct. 2718, 2732, 49 L.Ed.2d 576 (1976). In this case, for example, the defendants might weigh the feasibility of preparing a single programmatic EIS embracing the actions of so many different independent government agencies. In any event, this court's inquiry is limited to whether the defendants abused their discretion in failing to prepare a programmatic EIS.

■ Plaintiffs allege that defendants have established a coherent, detailed plan to sell public property, and that the plan is

likely to have wide-ranging environmental consequences. Moreover, plaintiffs claim that defendants have actually begun to sell federal lands pursuant to the plan without preparing either a site-specific or programmatic EIS at all. I rule that, for purposes of this motion to dismiss, plaintiffs have alleged facts sufficient to state a claim under NEPA for defendants' alleged abuse of discretion in failing to prepare a programmatic EIS.

Plaintiffs also allege in Count I that defendants have violated CEQ regulations by failing to prepare an "environmental assessment." 40 C.F.R. § 1501.4. An environmental assessment is a "concise public document ... that serves to: (1) Briefly provide sufficient evidence and analysis for determining whether to prepare [an EIS.]" 40 C.F.R. § 1508.9.

CEQ regulations, in fact, prescribe two methods by which an agency may determine whether its proposal is one requiring preparation of an EIS. First, it may prepare an environmental assessment setting out the evidence and analysis of the agency's decision. 40 C.F.R. § 1501.4. Second, the agency may use its own procedures supplementing CEQ regulations, as an alternative to the environmental assessment process. *Id.* Such alternative agency procedures must be developed in consultation with the CEQ, and must meet the specific requirements of the CEQ as set out in 40 C.F.R. § 1507.3.

Plaintiffs allege that defendants have neither prepared an environmental assessment, nor adopted specific procedures supplementing CEQ guidelines. I rule that those allegations are sufficient to state a claim for violation of CEQ regulations.

In Count II, plaintiffs allege specifically that defendants have violated NEPA by implementing the new program without preparing an EIS. Because Count II simply repeats in part plaintiffs' claims set out in Count I, I rule that it should be dismissed.

In Count III, plaintiffs allege that defendants' "program" is "in clear violation of NEPA's environmentally protective policies and constitutes an abuse of statutory discretion." NEPA's requirements are essentially procedural. *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). A Court should, however, make a *substantive* review of an agency's action to "assure itself that the agency has given good faith consideration to the environmental consequences of its actions." *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1st Cir.1980).

The complaint alleges that defendants have implemented a policy of widespread sale of federal lands without *any* consideration of its impact on the environment. That is sufficient to state a cause of action under NEPA. Accordingly, defendants' motion to dismiss Count III should be denied.

### The LWCA

In Count IV, plaintiffs allege that defendants have violated the Land and Water Conservation Fund Act of 1965, 16 U.S.C. 460*l*–4 *et seq.* ("LWCA"). The LWCA requires that "all proceeds ... received from any disposal of surplus real property and related personal property under the [FPAS]" shall be credited to the Land and Water Conservation Fund (the "Fund"). 16 U.S.C. § 460*l*–5(a). Plaintiffs allege that defendants' proposed use of the proceeds from sales of excess property to offset the national debt and their failure to pay the proceeds into the Fund violate the LWCA.

Plaintiffs have not, however, alleged the "threatened or actual injury" resulting from defendants' alleged violation of the LWCA necessary to establish standing. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397, 401 (1st Cir.1977). Congress, under the LWCA, may appropriate as much or as little money for conservation

purposes from the Fund as it may choose, 16 U.S.C. §§ 460*l*–7—460*l*–10, and it may supplement that amount by moneys from other revenue sources. I rule that it is speculative at best to predict that defendants' failure to pay proceeds from property sales into the Fund has reduced, or is likely to reduce, the amount of Congressional appropriations for federal or state conservation projects.

Moreover, it is not likely that the desired exercise of this Court's remedial powers would remedy any such injury. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Plaintiffs have alleged no facts tending to show that an order of this Court requiring defendants to pay all proceeds from sales of federal property into the Fund would increase the overall Congressional appropriation for conservation programs.

For those reasons, I rule that plaintiffs lack standing to assert defendants' alleged violation of the LWCA, and that Count IV should be dismissed.

The FPAS

Plaintiffs' Counts V and VI allege violations of the Federal Property and Administrative Services Act, 40 U.S.C. § 471 *et seq.* ("FPAS"). The FPAS, and the regulations promulgated thereunder, govern the disposition of surplus federal property. The FPAS provides that the Administrator of General Services "shall have supervision and direction over the disposition of surplus property." 40 U.S.C. § 484(a). In the usual case, disposals of surplus property will be made at a public auction after public advertising for bids, and GSA will accept bids from a "responsible bidder whose bid, ... will be most advantageous to the Government, price and other factors considered." 40 U.S.C. § 484(e)(2)(C). Under the FPAS, the GSA has the right to reject all bids when "it is in the public interest to do so." *Id.* The statute provides that GSA has the authority to convey surplus properties to state and local governments, and to other eligible groups, at below market value cost. 40 U.S.C. § 484(j), (k) (Supp.1984).

In addition, the FPAS gives the President broad authority to "prescribe such policies and directives, not inconsistent with the provisions of [the] Act, as he shall deem necessary to effectuate the [FPAS'] provisions." 40 U.S.C. § 486(a).

The PRB's alleged program provides that conveyances to all parties, including state and local governments, will be made generally only at fair market value. The PRB has enumerated three exceptions to this rule. Surplus property may be conveyed to state and local governments at below fair market value if:

(1) the property is to be used as a correctional facility;

(2) the transfer was started before March 1, 1982, and cancellation would cause an extreme hardship to the community; or

(3) the request for a discounted conveyance is of exceptional merit and the proposed use is also the highest and best use.

In Count V plaintiffs allege that the "GSA's new policy ... of only accepting the highest bid or fair market value for land violates the FPAS Act and implementing regulations which require a consideration of other factors, including environmental ones." In Count VI, plaintiffs allege that the "GSA's new rule ... of refusing to convey properties to state and local governments and other eligible groups at below market value cost violates the FPAS Act." Plaintiffs allege that the GSA's policies/rules also constitute an abuse of statutory discretion and are violations of the Administrative Procedures Act.

Defendants argue that Counts V and VI cannot be viewed as claims arising directly under the FPAS because no private right of action can be implied under the statute for these plaintiffs. The Court agrees. The central inquiry regarding private enforcement actions is "whether Congress intended to create a private right of action." *California v. Sierra Club*, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). The Court finds no

indication of such an intent in the language of the FPAS or in its legislative history. The FPAS provides various means for the disposal of surplus federal property, and, as such, is designed to benefit the public generally by improving the federal government's management of surplus property. It does not focus on plaintiffs or their specific environmental concerns, nor does it vest any rights or privileges in the plaintiffs. Accordingly, because plaintiffs are not a "particular class of beneficiaries whose welfare Congress intended to further," 451 U.S. at 294, 101 S.Ct. at 1779, I rule that they do not have a private right of action under the FPAS.

Plaintiffs' claims that defendants have failed to comply with the FPAS may be construed, however, as arising under the APA. The APA provides a right of action to review an agency's abuse of discretion. 5 U.S.C. § 702. The scope of judicial review under the APA, however, is not limitless. Title 5 U.S.C. § 701(a)(2) specifically precludes review when the government's action is "committed to agency discretion by law." I rule that this is the situation here. The FPAS confers upon the President broad discretion to promulgate policies and directives to effectuate the statute's provisions. 40 U.S.C. § 486(a). The only limit on the President's power is that his policies and directives must be consistent with the provisions of the Act. This Court, therefore, may review plaintiffs' claims only to the extent they allege an inconsistency between the PRB program and the FPAS. Beyond that, the Court has no authority to review plaintiffs' claims. *See* 5 U.S.C. § 701(a)(2). *See, also, Northrop University v. Harper,* 580 F.Supp. 959 (C.D.Cal.1983); *Ono v. Harper,* No. 82–0766 (D.Haw. June 7, 1983).

■ The Court rules, on the basis of the pleadings, that Executive Order 12348 and the PRB's program are consistent with the FPAS. The guidelines issued by the PRB do not prohibit discount conveyances to state and local governments. Nor does the new policy prevent the GSA from considering factors other than price when deciding whether or not to convey surplus property. The PRB program merely limits the scope of public conveyances and provides guidelines for determining when such conveyances should be made. *Northrop University v. Harper,* at 964. Because plaintiffs have pleaded no facts showing that the PRB's program is inconsistent with the FPAS, I rule that Counts V and VI fail to state a claim, and that those Counts should be dismissed.

The APA

■ Plaintiffs allege in Count VII that defendants have violated the APA and the common law by promulgating "this new program without any notice or comment or compliance with rulemaking procedures mandated by ... the APA." However, 5 U.S.C. § 553, which governs notice and comment procedures for rulemaking, exempts from its requirements any "matter relating ... to public property." 5 U.S.C. § 553(a)(2). That exemption applies to *any* rulemaking that is "clearly and directly involved" with public property. *National Wildlife Federation v. Snow,* 561 F.2d 227, 231–32 (D.C.Cir.1976); *see also Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070, 1082 (D.C.Cir.1978). Defendants' alleged rulemaking specifically governs the disposition of federal properties. Because any such rulemaking clearly and directly involves public property, I rule that Count VII should be dismissed as against all defendants except, for reasons set out below, defendants Watt and Block.

■ Rules and regulations promulgated by the Secretary of Interior and the Secretary of Agriculture are not exempt from the notice and comment requirements of the APA. 43 U.S.C. § 1740 (Supp.1984). Plaintiffs have appended to the complaint a "fact sheet" of the Department of Interior describing that Department's "Audit Management Program," and a news release from the Department of Agriculture describing its own similar program. Defendants argue that those documents are merely "general statements of policy," not bind-

ing rules, and, consequently, that they should be exempt from the rulemaking requirements of § 553. "A matter of judgment is involved in distinguishing between rules, however discretionary in form, that effectively circumscribe administrative choice, and rules that contemplate that the administrator will exercise an informed discretion in the various cases that arise." *American Bus Association v. United States*, 627 F.2d 525, 530 (D.C.Cir.1980), *quoting Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 667 (D.C.Cir.1978). In deciding whether an agency's pronouncement is in fact subject to the APA's notice and comment provisions, the Court should "scrutinize[ ] the language of the purported statement and the circumstances of its promulgation." *American Bus Association v. United States*, 627 F.2d at 530.

■ The documents issued by the Departments of Interior and Agriculture purport to describe departmental procedures for inventorying, selling or otherwise disposing of federal properties according to the PRB's program. Although the precise effect they will have on departmental action is unclear from the statements themselves, it may well be that, taken in context, these and similar statements establish binding norms effectively supplanting administrative discretion. For those reasons, defendants' motion to dismiss Count VII as to defendants Watt and Block should be denied.

## The FLPMA

■ Finally, in Counts ، VIII and IX, plaintiffs claim that the Bureau of Land Management's ("BLM's") "new policy to transfer up to 4 million acres of BLM land to private ownership" violates the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.* (Supp.1983) ("FLPMA"). The FLPMA declares the policy of the United States that "public lands be retained in Federal ownership, unless . . . it is determined that disposal of a particular parcel will serve the national interest." 43 U.S.C. § 1701(a)(1).

Defendants argue that plaintiffs lack standing to challenge the alleged violations of the FLPMA. The complaint alleges that defendants intend to sell federal lands which plaintiffs use for recreational and aesthetic purposes. That constitutes a sufficient injury in fact to meet the Case and Controversy requirement of Article III. Plaintiffs' recreational and aesthetic use of the land falls within the FLPMA's zone of interest. The statute requires the Federal government to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; . . . and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). Moreover, declaratory or injunctive relief would likely prevent any such unlawful sale of public properties, and would thus alleviate any threatened injury to plaintiffs. For those reasons, I rule that plaintiffs have standing to challenge defendants' alleged violation of the FLPMA.

■ Plaintiffs allege that defendants' policy violates the FLPMA "by reversing the statutory presumption that BLM land is to be retained except in limited circumstances." The FLPMA provides specifically that federal lands may be sold if the Secretary of Interior "determines that the sale of [any] such tract [of land] meets the following disposal criteria:

(1) such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands, and is not suitable for management by another Federal department or agency; or

(2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or

(3) disposal of such tract will serve important public objectives . . . which cannot be achieved prudently or feasibly on land other than public land and which outweigh other public objectives and val-

ues ... which would be served by maintaining such tract in Federal ownership." 43 U.S.C. § 1713. Plaintiffs allege no facts, however, tending to show that defendants intend to sell any federal lands not meeting the requirements set out in § 1713. Nor do they allege facts showing or tending to show that the PRB's program is designed to do anything other than expedite sales which are otherwise legitimate under the FLPMA.

Plaintiffs also allege that defendants' policy "violates the FLPMA by injecting the national deficit and national revenue considerations into the FLPMA land management process." However, a sale which meets the disposal criteria of § 1713 does not otherwise violate the FLPMA merely because the decision to sell is based in part on "national revenue considerations." The FLPMA itself requires that the government demand full fair market value for the land. § 1713(d).

For those reasons, I rule that Counts VIII and IX do not state claims for which relief may be granted under the FLPMA, and should, therefore, be dismissed.

Order accordingly.