**INTERNATIONAL BROMINATED SOLVENTS ASSOCIATION; National Mining Association; Aerosafe Products, Inc.; and Anchor Glass Container Corp., Plaintiffs,**

v.

**AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC.; Elaine Chao, Secretary, United States Department of Labor; and Michael O. Leavitt, Secretary, United States Department of Health and Human Services, Defendants.**

No. 5:04CV394 (DF).

United States District Court, M.D. Georgia, Macon Division.

March 11, 2005.

William Camp Harris, Macon, GA, Henry Z. Chajet, Washington, DC, for Plaintiff.

David K. Monroe, Daniel Bensing, Elizabeth J. Shapiro, Washington, DC, Matthew T. Strickland, William David Gifford, Macon, GA, for Defendants.

## ORDER

FITZPATRICK, District Judge.

There are currently three Motions to Dismiss pending before the Court: two have been filed by Defendant American Conference of Governmental Industrial Hygienists, Inc. ("ACGIH") (tabs 27 & 32)[1] and one has been jointly filed on behalf of Defendants Elaine Chao, Secretary, United States Department of Labor, and Michael O. Leavitt,[2] Secretary, United States Department of Health and Human Services ("federal defendants") (tab 43). Because the motions raise similar issues, they will be considered together.

This action has been initiated to prevent the adoption and enforcement of workplace-safety exposure levels for four chemical substances—silica, copper, n-propyl bromide ("nPB"), and diesel particulate matter ("DPM"). Plaintiffs are International Brominated Solvents Association ("IBSA"), National Mining Association ("NMA"), AeroSafe Products, Inc., ("AeroSafe"), and Anchor Glass Container Corporation ("Anchor Glass"). IBSA and NMA are trade associations whose members deal in the four substances at issue. They have consequently alleged claims on behalf of their members. AeroSafe and Anchor Glass, each of whom deal in at least one of the substances at issue, allege claims on their own behalf. Plaintiffs collectively maintain that the safety levels, known as Threshold Limit Values ("TLVs"), are adopted by ACGIH and enforced by the federal defendants in violation of federal and state law.

Specifically, the allegations in Plaintiffs' complaint are set forth in five counts: Count I asserts a claim against all defendants for violations of the Federal Advisory Committee Act ("FACA"), 5 U.S.C.A.App. 2 § 1 et seq. (West 1996); Count II asserts a claim against all defendants for violations of the Administrative Procedure Act ("APA"), 5 U.S.C.A. § 551 et seq. (West 1996); Count III asserts a claim against ACGIH for violations of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10–1–372 (Lexis 2000); Count IV asserts a claim against ACGIH for tortious interference with contractual and business relations; and Count V asserts claims against one of the federal defendants, the United States Department of Labor, for violations of the APA, the

---

1. This litigation was commenced by Plaintiffs International Brominated Solvents Association and AeroSafe Products, Inc. IBSA and AeroSafe subsequently filed a First Amended Complaint adding Plaintiffs National Mining Association and Anchor Glass Container Corporation. Defendant ACGIH filed a motion to dismiss in response to each complaint. Because of the general rule that an amended complaint supercedes a previously filed complaint, the Court will consider Plaintiffs' First Amended Complaint controlling. See Wilson v. First Houston Inv. Corp., 566 F.2d 1235, 1237–38 (5th Cir.1978) ("As a general rule an amended complaint supercedes and replaces the original complaint, unless the amendment specifically refers to or adopts the earlier pleading."), vacated on other grounds, 444 U.S. 959, 100 S.Ct. 442, 62 L.Ed.2d 371 (1979).

2. The former Secretary of the United States Department of Health and Human Services, Tommy Thompson, was a named defendant in Plaintiffs' First Amended Complaint. However, a new Secretary, Michael O. Leavitt, has since been appointed to that post, and he is hereby substituted as a named defendant in this lawsuit pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Federal Register Act ("FRA"), 44 U.S.C.A. § 1501 *et seq.* (1991), the Paperwork Reduction Act ("PRA"), 44 U.S.C.A. § 101 *et seq.* (1991), and the Due Process Clause of the Fifth Amendment.

The parties have addressed the relevant legal issues by written memoranda and oral argument, and the Court has given careful and full consideration to the matter. For the reasons explained below, Defendants' motions are **GRANTED** in part and **DENIED** in part.

## I. FACTS

This lawsuit involves an attempt to enjoin the adoption and enforcement of four TLVs adopted by the ACGIH. Plaintiffs allege that ACGIH's TLVs are illegally adopted, illegally enforced by the federal government, and cause Plaintiffs and their members to suffer severe economic injury. In addition to seeking declaratory and injunctive relief, Plaintiffs seek damages for anticipated reductions in profits, increased regulatory costs, and increased litigation exposure.[3]

Plaintiff IBSA is an Illinois non-profit trade association that represents the interests of businesses which produce, use, or otherwise deal in brominated products, including nPB, that are affected by ACGIH's TLVs. Plaintiff NMA, a non-profit, national trade association incorporated in Delaware, represents members who produce coal, metals, and minerals affected by the TLVs in question. Plaintiff AeroSafe is a Georgia corporation that sells products containing nPB to the aviation industry. Plaintiff Anchor Glass is a glass manufacturer incorporated in Delaware with facili-

ties in the Middle District of Georgia. Anchor Glass is particularly interested in the TLV for silica, a substance which is of critical importance to the glass industry.

Defendant ACGIH is a private, non-profit association consisting of professionals who work in the field of occupational safety. Its members are employed in both the public and private sectors as well as in academia. Among the services performed by ACGIH is the creation of TLVs which are included periodically in publications sold to the public. A TLV is a numerical value assigned to a substance and is designed by ACGIH to suggest the maximum exposure level at which a person may be exposed to a given substance and yet remain safe from the health risks associated with that substance. New TLVs are adopted, and current TLVs are reviewed, at the request of an ACGIH committee member. When such a request is made, the ACGIH Board places the substance on its "Under Study" list, which is then published each year in ACGIH's books, magazines, newsletters and on its website. ACGIH invites public comment and solicits information regarding the substances under study.

Once a substance has been posted to the "Under Study" list, an ACGIH subcommittee member is responsible for gathering supporting documentation for the proposed TLV and submitting a draft of the TLV to his or her subcommittee and then to the full committee. After the ACGIH Board of Directors ratifies a proposed TLV, a Notification of Intended Change ("NIC") is posted in various ACGIH publications and on its website.

TLV proposals retain their status as proposals for approximately one year while

---

**3.** The recitation of facts is drawn from Plaintiffs' First Amended Complaint, Plaintiffs' responses to Defendants' motions to dismiss, and from the Order issued by Judge Lawson on November 26, 2004, denying Plaintiffs' request for preliminary injunctive relief.

the public is invited to submit information relevant to their adoption. The posting of the NIC and the exchange of public comment take place through ACGIH publications rather than through the Federal Register. Plaintiffs maintain that none of the information provided by the public is considered in the decision to adopt a final TLV; that the TLVs are false and deceptive because they are not supported by credible science; and that the TLVs are drafted in secret by undisclosed ACGIH members.

The federal defendants, are charged with, among other things, ensuring the safety of American workers. In furtherance of this goal, Congress has delegated authority to DOL to design procedures for disseminating information about the presence of hazardous materials in the workplace. DOL's Hazard Communication Rule, 29 C.F.R. § 1910.1200, incorporates by reference ACGIH's TLVs as establishing certain substances or materials deemed to be hazardous. The Rule also imposes affirmative obligations on employers. For instance, it requires that employers who deal in TLV-covered substances publish lists alerting their employees and others that such substances may compromise their safety.

Plaintiffs challenge the federal government's reliance on TLVs to indicate which substances pose a risk to workplace safety. This reliance, according to Plaintiffs, effectively turns TLVs into binding federal rules, which are promulgated in violation of the APA. In addition, Plaintiffs contend that the federal government may not properly make use of the TLVs because

ACGIH violates the requirements of FACA, thereby making its work invalid.

Plaintiffs filed their First Amended Complaint on December 13, 2004, "seek[ing] declaratory and injunctive relief" to prohibit ACGIH from "considering, creating, publishing, promulgating, adopting, using, or recommending" TLVs for silica, copper, nPB, and diesel particulate matter. Pls.' Am. Compl., tab 24, at ¶ 1. Plaintiffs also seek "to prohibit federal government Defendants from allowing their officials and employees to seek, suggest, use, adopt, rely upon, promulgate, or enforce" such TLVs. Pls.' Am. Compl., tab 24, at ¶ 1. Finally, Plaintiffs request "compensation for damages from and caused by Defendant ACGIH." Pls.' Am. Compl., tab 24, at ¶ 1.[4]

It should be noted at the outset that Anchor Glass, along with a number of other plaintiffs, brought a similar suit against the same defendants in this Court approximately four years ago. Though some of the issues raised in that suit overlap some of the issues now before the Court, the most significant ones do not. For instance, a review of the Court's Order on the defendants' motion to dismiss in the prior lawsuit reveals that the Court did not address the private-right-of-action argument made in this case. Nor did the Court address the requirements a plaintiff must meet to challenge an agency action under the APA. Therefore, the claims asserted in each case are sufficiently distinct that the Court sees little reason to rely heavily on its prior decision to support the conclusions reached below.

## II. STANDARD OF REVIEW

Defendants move to dismiss the claims in Plaintiffs' amended complaint under

---

4. *Plaintiffs filed their original complaint on November 17, 2004, and subsequently moved, before filing their amended complaint, for a temporary restraining order to prevent* ACGIH from approving the TLVs in question at its annual meeting. After a hearing in front of Judge Hugh Lawson, that motion was denied on November 26, 2004 (tab 19).

Rule 12(b)(6) of the Federal Rules of Civil Procedure, except with respect to the claims asserted in Counts I and V, which Defendants move to dismiss under Rule 12(b)(1). The standard to be applied under Rule 12(b)(1) will be discussed ·in the section devoted to standing.

The purpose of a Rule 12(b)(6) motion is to determine whether the plaintiff's complaint states a legally sufficient claim for relief. *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (2d ed. 1990 & Supp. 2000). The Supreme Court has articulated the following standard for evaluating a Rule 12(b)(6) motion:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As this standard indicates, the complaint must be construed in the light most favorable to the plaintiff, and the facts as alleged must be accepted as true. *See Kirby v. Siegelman,* 195 F.3d 1285, 1289 (11th Cir.1999). However, the district court is not required to accept as true the plaintiff's conclusions of law. *See Solis–Ramirez v. United States Dep't of Justice,* 758 F.2d 1426, 1429 (11th Cir.1985). If the facts alleged in the complaint would allow the plaintiff to re-cover under any possible theory, the motion must be denied, regardless of whether they would allow recovery under the particular theory pleaded by the plaintiff. *See Linder v. Portocarrero,* 963 F.2d 332, 336 (11th Cir.1992). Because this standard imposes such a heavy burden on the defendant, *see Beck v. Deloitte & Touche,* 144 F.3d 732, 735–36 (11th Cir.1998), Rule 12(b)(6) motions are rarely granted. *See St. Joseph's Hosp., Inc. v. Hospital Corp. of Am.,* 795 F.2d 948, 953 (11th Cir.1986). With these principles in mind, the Court turns to its analysis of Plaintiffs' complaint.

## II. DISCUSSION

### A. COUNT I—The Federal Advisory Committee Act ("FACA")

Defendants argue that the Court is without jurisdiction to consider Plaintiffs' FACA claims because Plaintiffs cannot establish standing. The federal defendants object to Plaintiffs' standing on both constitutional and prudential grounds (that FACA lacks a private right of action), while ACGIH focuses only on the latter. Defendants assert that the jurisdictional deficiencies they have identified compel dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure.[5] Plaintiffs, on the other hand, contend that they have pleaded facts sufficient to establish Article III standing and that courts have long recognized an implied private right of action under FACA.

#### 1. Standing

█ Under Rule 12(b)(1) two types of jurisdictional attacks can be made—"fa-

---

**5.** Challenges to a party's standing are properly raised in a Rule 12(b)(1) motion to dismiss. *See Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1242 (11th Cir.2003) (noting that "because the constitutional standing doctrine stems directly from Article III's 'case or controversy' requirement, th[e] [standing] is-sue implicates our subject matter jurisdiction, and accordingly must be addressed as a threshold matter...."). *See also Steffan v. Cheney,* 733 F.Supp. 115, 116 (D.D.C.1989) ("a motion to dismiss for lack of standing can only be brought under Federal Rule of Civil Procedure 12(b)(1).").

cial" attacks and "factual" attacks. *See McMaster v. U.S.*, 177 F.3d 936, 940 (11th Cir.1999). " 'Facial attacks' on the complaint 'require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true....' " *Id.* The arguments advanced by Defendants are "facial" in that they do not rely on ·information outside of the complaint. Therefore, for purposes of the standing analysis, the Court presumes that Plaintiffs allegations are true.

■■■ The fact that a standing challenge has been raised at this stage of the litigation has an important effect on Plaintiffs' required showing because "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Miccosukee Tribe of Indians of Florida v. Southern Everglades Restoration Alliance*, 304 F.3d 1076, 1080–81 (11th Cir.2002) (comparing the burden necessary to establish standing at the motion-to-dismiss stage of a lawsuit with the more detailed burden required at the summary-judgment stage; noting that "[w]ithout discovery, [a plaintiff] is not expected to allege more particular information."). While general allegations of injury are usually sufficient to defeat a motion to dismiss, the Court must nevertheless "evaluate standing based on the facts alleged in the complaint, and ... may not speculate concerning the existence of standing or piece together support for the plaintiff." *Shotz v. Cates*,

256 F.3d 1077, 1081 (11th Cir.2001) (internal quotations omitted). Similarly, "[a] federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. 149, 155–56, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

■■■ Plaintiffs invoke the jurisdiction of this Court by asserting claims under FACA—a federal statute.[6] *See* 28 U.S.C.A. § 1331 (West 2004) (federal question jurisdiction). As a result, Plaintiffs bear the burden of establishing standing. *See Koziara v. City of Casselberry*, 392 F.3d 1302, 1304 (11th Cir.2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "If a plaintiff lacks standing, the 'case' or 'controversy' requirement of Article III, § 2 of the U.S. Constitution is not satisfied, and the case must be dismissed." *Id.* The standing doctrine is concerned with "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It embodies "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Id.*

■■■ To establish Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) ·concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; ·(2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Koziara*, 392 F.3d at 1304 (cit-

---

**6.** Plaintiffs claims under the APA, *see infra.,* do not confer independent subject matter jurisdiction on the Court. *See City of Chicago v.*

*Int'l College of Surgeons,* 522 U.S. 156, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997).

ing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). If a plaintiff fails to show any one of these, he may not maintain an action in federal court.

In addition to the constitutional requirements, there are certain prudential standing principles, judicially developed over time, which operate to limit the exercise of federal jurisdiction. *See Medical Ass'n of State of Ala. v. Schweiker,* 554 F.Supp. 955, 960 (M.D.Ala.1983) ("[E]ven if the constitutional requirement of an injury in fact is met, a suing party may still lack standing" because of prudential considerations). The prudential consideration implicated in this case is whether Plaintiffs have a right to seek judicial relief under FACA. The Supreme Court has noted that "the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing.... Essentially, the standing question in such cases is *whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Warth,* 422 U.S. at 500, 95 S.Ct. 2197 (emphasis added). Resolution of this issue turns on whether Congress intended FACA's requirements to be enforceable through a private right of action. *See City of Albuquerque v. U.S. Dept. of Interior,* 379 F.3d 901, 913 (10th Cir.2004) (treating the private-right-of-action inquiry as a matter of prudential standing).

Because the federal defendants' standing arguments overlap in some, but not all, respects with those asserted by ACGIH,

the Court will conduct its own analysis, as it is independently obligated to do. First, the Court will address the standing of those plaintiffs suing on their own behalf. Next, the Court will consider the standing of the associational plaintiffs suing on behalf of their members. And, finally, the Court will conclude by examining whether FACA provides a private right of action.[7]

### a. *AeroSafe, Anchor Glass and NMA* (individual capacity)

Plaintiff AeroSpace is a Georgia corporation that "represents and sells products used by innovative chemical and equipment suppliers to the aviation maintenance industry, including products that contain nPB." Pls.' Am. Compl., tab 24, at ¶ 6. Plaintiff Anchor Glass is a Delaware corporation "with substantial glass manufacturing facilities in Houston County, Georgia" that "has an interest in the TLV levels for all of the substances in question in this litigation, and particularly silica, a substance that is critical to the glass industry." Pls.' Am. Compl., tab 24, at ¶ 7. Plaintiff NMA is a trade association, but, in addition to pursuing claims on its members behalf, it alleges an independent injury. Specifically, NMA alleges that it "suffers direct harm when its members are harmed because NMA relies upon and receives revenues from its members. Thus, if NMA's members' sales are harmed, resulting in a decrease in revenue, NMA also suffers economic harm." (emphasis added). Pls.' Am. Compl., tab 24, at ¶ 4. When an organization like NMA chooses to sue on its own behalf, it must meet the same requirements demanded of individual plaintiffs. *See Havens Realty Corp. v.*

---

**7.** The constitutional standing analysis applies to all five counts of Plaintiffs' amended complaint, while the private-right-of-action inquiry is relevant only to the FACA claims contained in Count I.

*Coleman,* 455 U.S. 363, 378, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

Having reviewed the amended complaint, the Court finds that AeroSpace, Anchor Glass, and NMA have pleaded sufficient facts to satisfy the constitutional standing requirements. Paragraphs 53 and 66 allege certain economic harms that will allegedly result from ACGIH's promulgation and the federal government's enforcement of the challenged TLVs. These paragraphs relate to the TLVs for silica and nPB—substances in which Aero-Space, Anchor Glass, and NMA's members deal. In addition there are sufficient facts to establish the requisite causal relationship between the harms predicted and Defendants' allegedly illegal conduct. And, finally, should AeroSafe, Anchor Glass, and NMA receive the relief they are requesting—either an injunction to prevent the use of the challenged TLVs or damages to compensate them for the alleged economic harm or both—their injuries will be redressed.

**b. *IBSA and NMA* (associational capacity)**

 Because IBSA and NMA are organizations seeking to represent the interests of their individual members, they must satisfy the requirements for associational standing. "An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the

lawsuit." *Hunt v. Washington State Apple Adver. Com'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Plaintiff IBSA is a "non-profit trade association ... made up of small businesses that deal with and produce solvents that are based upon brominated products, including nPB." Pls.' Am. Compl., tab 24, at ¶ 5. nPB is one of the substances for which ACGIH develops TLVs. Plaintiff NMA is "a national trade association" whose "members include producers of America's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment and supplies; and engineering and consulting firms that serve the mining industry." Pls.' Am. Compl., tab 24, at ¶ 3. The substances used by NMA members are affected by the TLVs adopted by ACGIH. *See* Pls.' Am. Compl., tab 24, at ¶ 35.

**i. *Injury, Causation & Redressability***

To proceed against Defendants, IBSA and NMA must first show that their individual members have standing to sue on their own behalf. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. To do this, the organizations must allege that at least one of their members has suffered or will suffer an injury-in-fact, caused by Defendants, and capable of redress by the relief sought. The Court is satisfied that the associations have pleaded sufficient facts to meet this threshold burden. As part of the injury-in-fact requirement, because declaratory and injunctive relief is sought,[8] IBSA and NMA must "allege facts from which it appears there is a substantial likelihood that [their members] will suffer

---

8. Plaintiffs also seek "compensation for damages from and caused by Defendant ACGIH."

Pls.' Am. Compl., tab 24, at ¶ 1.

injury in the future." *Malowney v. Federal Collection Deposit Group,* 193 F.3d 1342, 1346 (11th Cir.1999).

Plaintiffs argue that placing a substance on ACGIH's "Under Study" list, which informs interested parties that a TLV change is being contemplated, "cause[s] concern among Plaintiffs' current and past employees and their representatives ... that the subject material causes adverse health effects." Pls.' Am. Copml., tab 24, at ¶ 15. Plaintiffs insist that this concern "results in market share loss, adverse media attention, adverse attention from attorneys seeking new class action claims, undue focus and adverse action from regulators and governmental bodies; and a variety of other adverse effects and economic costs." Pls.' Am. Compl., tab 24, at ¶ 15. Plaintiffs "are adversely affected" and "will be adversely affected" by the adoption and enforcement of the TLVs for the substances at issue in this suit. IBSA's members "produce, process and sell nPB, which is used to clean substances, including materials copper and silica." Pls.' Am. Compl., tab 24, at ¶ 64. The proposed TLV for nPB will cause its members "economic loss, product disparagement, and new risks of liability." Pls.' Am. Compl., tab 24, at ¶ 66. Similarly, NMA alleges that its members "produce products from ore bodies that contain silica, and produce and use products that contain silica." Pls.' Am. Compl., tab 24, at ¶ 35. NMA maintains that adoption and enforcement of the silica TLV "will create new and unjustified regulatory burdens, cause product substitutions displacing Plaintiffs' and their members' markets, cause community opposition to site

permits, result in economic loss, product disparagement, and create new risks of liability, including increased tort litigation." Pls.' Am. Compl., tab 24, at ¶ 53. IBSA and NMA maintain that some of these injuries have already been sustained and that they will continue to be sustained as long as the suspect TLVs remain in effect. The Court is satisfied that the injuries alleged are not so conjectural or speculative as to defeat the injury-ln-fact requirement. *See Miccosukee,* 304 F.3d at 1080.

With respect to causation, IBSA and NMA allege that these injuries (loss of revenue, increased regulatory costs, increased litigation exposure, etc.) are directly attributable to ACGIH's adoption of, and the federal government's enforcement of, stricter TLVs than those currently in place. For present purposes, this allegation is sufficient to show the necessary causal relationship between the injury to be prevented and the person or entity to be held responsible.

Finally, regarding the likelihood-of-redressability requirement, IBSA and NMA have moved for injunctive relief to prevent the federal government from enforcing those TLVs already adopted.[9] If the Court issues an injunction to that effect, their grievances will be redressed and this requirement will be satisfied.

### ii. Interests Germane to Purpose

IBSA and NMA must next show that the interests they seek to protect are germane to their purpose. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. Both IBSA and NMA are non-profit trade associations that represent the interests of their con-

---

**9.** IBSA and NMA also seek, on behalf of their members, damages from ACGIH for the lost revenue which begins almost as soon as TLVs

are adopted and enforced. For reasons discussed below, such relief is barred under these circumstances.

stituent members. Though the amended complaint does not contain an extensive discussion about the purpose of these associations, their purpose and the interests sought to be protected here (largely economic) need only be reasonably related. *See Medical Ass'n of State of Ala. v. Schweiker*, 554 F.Supp. 955, 965 (M.D.Ala. 1983), *aff'd by, Medical Association of State of Ala. v. Heckler*, 714 F.2d 107 (11th Cir.1983). The Court finds that there is a reasonable connection between the purpose served by a trade association and the vindication of its members' economic interests. *See International Union, UAW v. Brock*, 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (noting that "the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others" and that "the very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests."). Therefore, the interests sought to be protected by this litigation are germane to IBSA's and NMA's purpose.

### iii. Individual Members Not Necessary for Relief

■ Finally, IBSA and NMA must show that the relief they seek does not require their members to participate in the lawsuit. The declaratory and injunctive relief sought by IBSA and NMA on behalf of their members does not require the individual participation of those members. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546, 116 S.Ct. 1529, 134

L.Ed.2d 758 (1996) (recognizing that " 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members."). In *Warth* the Supreme Court noted that "whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a *declaration, injunction, or some other form of prospective relief,* it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, *the relief sought has been of this kind.*" 422 U.S. at 515, 95 S.Ct. 2197. *See United Steelworkers of America, AFL–CIO v. Univ. of Alabama*, 599 F.2d 56, 59 (5th Cir.1979).[10] Conversely, an association does not have standing to maintain a suit seeking damages for losses sustained only by its members. *See Warth*, 422 U.S. at 515–16, 95 S.Ct. 2197 (noting with respect to damages claims that "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof."); *see also Pennsylvania Psychiatric Soc. v. Green Spring Health Serv., Inc.*, 280 F.3d 278, 284 (3rd Cir.2002) ("Because claims for monetary relief usually require individual participation, courts have held associations cannot generally raise these claims on behalf of their members."). It may, of course, have standing to maintain an action for damages arising out of its own injury. Therefore, to the extent that any of

---

10. The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

IBSA's or NMA's seek damages for their members' economic losses, such claims are hereby dismissed.

### c. *Private Right of Action*

■ In addition to the constitutional standing requirements, Defendants raise another jurisdictional argument: That FACA does not contain a private right of action.[11] FACA was enacted by Congress in 1972 to reform the use of the growing number of boards and commissions created to advise officers and agencies in the executive branch of the Federal Government. This legislation was in part a fat-trimming measure, prompted by Congress's express recognition that such committees should be terminated "when they are no longer carrying out the purposes for which they were established." 5 U.S.C.A.App. 2 § 2(b)(3) (West 1996). Additionally, FACA was aimed at bringing "standards and uniform procedures" to the "establishment, operation, administration, and duration of advisory committees." 5 U.S.C.A.App. 2 § 2(b)(4). To this end, FACA imposes a number of requirements on advisory committees.

Plaintiffs allege that ACGIH has violated FACA by failing to comply with certain of these requirements, including: failing to file a charter with the appropriate governmental official; failing to give timely notice of meetings; failing to have a "fair and balanced" membership; failing to hold committee meetings open to the public; failing to keep detailed minutes of meetings; failing to make public the documentation and evidence on which it relies in formulating TLVs; and failing to guard against inappropriate influence. *See* Pls.' Compl., tab 1, at ¶ 84; *see also* Pls.' Am. Compl., tab 24, at ¶ 91. Assuming these allegations are true, the Court must now ascertain whether Plaintiffs are entitled to seek redress under this statute.

■ It is worth noting as a preliminary matter that "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Instead, "[t]he question of the existence of a statutory cause of action is, of course, one of statutory construction." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (citing *Cannon*, 441 U.S. at 688, 99 S.Ct. 1946). To determine whether a private right of action exists under a given statute, courts are obligated to apply the analysis set forth by the Supreme Court in *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). In *Sandoval*, which involved the interpretation of Title VI of the Civil Rights Act of 1964, the Court noted that "[l]ike substan-

11. "[T]he existence of a private right of action ... goes to the subject matter jurisdiction of the court." *Sierra Club v. Hodel*, 848 F.2d 1068, 1076 n. 6 (10th Cir.1988), *overruled on other grounds by, Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992). *See Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1345 (11th Cir. 1997) (noting that a private right of action is a jurisdictional prerequisite); *see also Oldfield v. Athletic Congress*, 779 F.2d 505, 508 (9th Cir.1985) (same). As the Tenth Circuit Court of Appeals aptly noted in *Hernandez–Avalos v. I.N.S.*, 50 F.3d 842, 846 (10th Cir.1995): "Faced with a statute whose enforcement is (arguably) entrusted solely to the government and which thus contemplates only the government as a plaintiff, the would-be private plaintiff argues for implication of a private right of action—*i.e.,* 'recognition of a supplemental private enforcement mechanism,' [citation omitted]—which will allow him to proceed where he would otherwise be barred by the rule against third-party standing."

tive federal law itself, private rights of action to enforce federal law must be created by Congress." 532 U.S. at 286, 121 S.Ct. 1511. Unless the statute in question evinces an intent to create a private remedy "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87, 121 S.Ct. 1511. The notion that courts are empowered to infer private rights of action simply to give effect to a statute's purpose was abandoned nearly thirty years ago in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Id.* at 287, 121 S.Ct. 1511. *See also Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche*, 442 U.S. at 568 (1979); *Cannon*, 441 U.S. at 688 (1979). In recent years, the Supreme Court has come to regard statutory intent as "the touchstone" of the private-right-of-action analysis. *See Love v. Delta Air Lines*, 310 F.3d 1347, 1352 (11th Cir.2002). In fact, statutory intent carries determinative weight. *Sandoval*, 532 U.S. at 286, 121 S.Ct. 1511.

■ When analyzing statutory intent, courts must limit their inquiry to three relevant sources: (1) "rights-creating" language contained in the statutory text; (2) the statutory structure within which the provision in question is embedded; and (3) legislative history—if, and only if, the statutory text and structure yield no conclusive answer. *See Love*, 310 F.3d at 1352–53.

The Court is aware of only two decisions in which FACA has been considered in light of the *Sandoval* analysis.[12] In each case, the result was the same: Congress did not intend for FACA to permit a private right of action. In *Natural Resources Defense Council v. Abraham*, 223 F.Supp.2d 162, 176 (D.D.C.2002), the court noted that "[t]he parties agree that FACA does not provide a private cause of action. The Supreme Court's recent decision [in *Sandoval* ] mandates a finding that FACA creates no private cause of action." The court went on to find that "[n]othing in the text of FACA supports a finding that Congress intended to create a private right to sue. While FACA clearly creates statutory rights and duties, this alone is insufficient to create a private remedy." *Id.* (internal citations omitted). *Abraham* was subsequently set aside for unrelated reasons by the D.C. Circuit Court of Appeals in *Natural Resources Defense Council v. Dep't of Energy*, 353 F.3d 40 (2004), but the district court's ruling on the private-remedy issue did not attract comment from the circuit court.

Similarly, in *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F.Supp.2d 20, 33 (D.D.C.2002), the court applied the *Sandoval* analysis and noted that it "ha[d] no choice but to hold that FACA creates no private right of action" . . . "[n]otwithstanding the many previous cases in which courts have implicity recognized [such a right]." The court based its conclusion on a review of FACA's text. *Judicial Watch* was subsequently vacated

---

12. While not expressly addressing *Sandoval*, at least one other court has noted that FACA does not contain a private right of action. *See Colorado Envtl. Coalition v. Wenker*, 353 F.3d 1221, 1234–35 (10th Cir.2004) ("Because neither the FLPMA nor the FACA contains a private right of action for those seek-ing to enforce the procedural requirements attending the creation and operation of federal advisory committees, the plaintiffs rely upon the judicial review provisions of the Administrative Procedure Act as the basis for their district court action.")

and remanded on unrelated grounds by the Supreme Court in *Cheney v. Dist. Court for Dist. of Coumbia*, 542 U.S. 367, 374–75, 124 S.Ct. 2576, 2583, 159 L.Ed.2d 459 (2004), in which the Court noted that "[t]he [district court] acknowledged FACA does not create a private cause of action. On this basis, it dismissed respondents' claims against the non-Government defendants." [13] The district court's finding that FACA lacked a private right of action, and its subsequent dismissal of the private defendants, did not elicit any discussion from the Court. Though the precise issue was not before the Court, its treatment of the lower court's disposition bolsters Defendants' position in this case.

Plaintiffs strenuously argue that both the Supreme Court and the Eleventh Circuit Court of Appeals have settled this issue by recognizing a private right of action under FACA. *See Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 452, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *see also Miccosukee Tribe of Indians of Fla. v. Southern Everglades Restoration Alliance*, 304 F.3d 1076 (11th Cir.2002); *Fla. Ass'n of Medical Equip. Dealers, Med–Health Care v. Apfel*, 194 F.3d 1227 (11th Cir. 1999); *Alabama–Tombigbee Rivers Coalition v. Dep't of Interior et al.*, 26 F.3d 1103 (11th Cir.1994). The Court is not unmindful of *Public Citizen* and the handful of cases the Eleventh Circuit has decided in which private litigants were allowed to sue under FACA to enforce its requirements. However, in none of those cases did either the Supreme Court or the court of appeals squarely face the question of whether a private right of action exists under FACA. Instead the courts were silent on that issue. Plaintiffs argue that this silence demonstrates that it is an "accepted" position that FACA contemplates a private right of action. In the absence of an express holding to that effect, however, this Court cannot in good conscience ignore what it perceives to be *Sandoval's* obligatory mandate.[14]

Plaintiffs also caution that *Sandoval's* teachings do not extend beyond Title VI of the Civil Rights Act of 1964. Pls.' Opp'n to Def. ACGIH's Mot. to Dismiss, tab 38, at 7 ("As the case at bar does not involve Title VI of the Civil Rights Act of 1964, [*Sandoval* ] is distinguishable."). However, this argument must be rejected, as the Eleventh Circuit's decision in *Love*, and the language of *Sandoval* itself, clearly demonstrates that *Sandoval's* holding is not as narrow as Plaintiffs suggest.

The Court has carefully studied FACA's text and structure and concludes that nei-

---

**13.** The district court in *Judicial Watch* allowed the plaintiff to proceed against the government defendants under the Mandamas Act, 28 U.S.C.A. § 1361 (West 1993) and the APA, 5 U.S.C.A. § 706 (West 1996).

**14.** Plaintiffs argue that *Sandoval* does not expressly overrule *Public Citizen* and that this Court should not read *Sandoval* as achieving such a result. This argument has some intuitive appeal, for the Supreme Court has stated: "We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d

391 (1997). But the Court went on to say that "[i]f a precedent of this Court *has direct application in a case*, yet appears to rest on reasons rejected in some other lines of decisions, [lower courts] should follow the case *which directly controls*, leaving to this Court the prerogative of overruling its own decisions." *Id.* (emphasis added). Here, this Court is not convinced that *Public Citizen* has direct application because it did not address the issue now before the Court. Therefore, it cannot be considered controlling in this instance and the better reading of *Sandoval* would seem to suggest that its principles apply with equal force to FACA.

ther evinces a congressional intent to confer on private litigants a right to enforce the statute's requirements. The Court is further persuaded by, and references for support, the thoughtful analysis on this point contained in Judge Lawson's TRO Order. Accordingly, Plaintiffs' FACA claims against ACGIH are dismissed. Plaintiffs' FACA claims against the federal defendants are also dismissed to the extent that they are pursued solely under FACA. If there is to be a viable basis for asserting FACA-based claims against ACGIH and the federal defendants, those claims must be pursued under the APA.

## B. COUNT II: The Administrative Procedure Act

Although Plaintiffs do not have a cause of action under FACA, they are nevertheless entitled to enforce FACA's substantive requirements [15] through the judicial review provisions of the APA, 5 U.S.C.A. §§ 551, 704, 706 (West 1996). *See Judicial Watch v. Nat'l Energy Policy Develop.*, 219 F.Supp.2d 20 (D.D.C. 2002), *vacated and remanded on other grounds, Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004); *see also Hernandez–Avalos v. I.N.S.*, 50 F.3d 842, 846 (10th Cir.1995) ("a plaintiff who lacks a private right of action under the underlying statute can bring suit under the APA to enforce the statute."). Specifically, Plaintiffs challenge Defendants' actions under § 706(2)(A), (2)(D)—

ACGIH for its direct noncompliance with the FACA's requirements, and the federal defendants for relying on and enforcing ACGIH's tainted work product (TLVs). *See* Pls.' Am. Compl., tab 24, at ¶ 95.

Section 706(2) of the APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with the law;* [or] (D) *without observance of procedure required by law.*" 5 U.S.C.A. § 706(2)(A),(D) (emphasis added). Judicial review is available under the APA for all "final agency action for which there is no other adequate remedy in a court," 5 U.S.C.A. § 704, and is foreclosed only "to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." Nothing in the applicable FACA provisions precludes judicial review under the APA and the majority of the FACA requirements Plaintiffs contend were violated are non-discretionary.[16]

Reduced to its essentials, Plaintiffs' APA argument proceeds as follows: ACGIH's activities are governed by FACA because it is an "advisory committee" within the meaning of FACA and relevant case law. ACGIH violates FACA by holding meetings, conducting business, and adopting and publishing TLVs in a manner that does not comply with the substantive requirements of FACA. *See* 5 U.S.C.A.App. 2 §§ 9, 10. Under the OSH Act the TLVs

---

**15.** Before FACA violations may be used as a predicate for APA review, Plaintiffs must establish that ACGIH is a covered entity under FACA—a requirement that is discussed below.

**16.** Plaintiffs also allege that the composition of ACGIH's membership is not "fair and balanced ... in terms of point of view." Pls.'

Am. Compl., tab 24, at ¶ 91. Defendants argue that decisions about board composition are discretionary and therefore not subject to judicial review. This is but one of the alleged violations, however. Because Plaintiffs allege many others, the Court finds that judicial review under the APA is not precluded.

adopted by ACGIH become incorporated by reference into the regulatory framework governing workplace safety, thereby giving TLVs the force and effect of law. By virtue of this incorporation, the TLVs, and all corresponding regulatory requirements triggered by their adoption, are enforced by the federal defendants. Thus, according to Plaintiffs, the federal defendants' reliance on the tainted work product (*i.e.*, the promulgated TLVs) of ACGIH is "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C.A. § 706(2)(A), (2)(D). Plaintiffs reason that, as a consequence of ACGIH's FACA violations, ACGIH has "no authority to meet or take any action regarding the subject TLVs" and that the federal defendants "cannot use or rely [on] ... or enforce" the proposed TLVs. Pls.' Am. Compl., tab 24, at ¶¶ 91, 92.

Before a plaintiff is entitled to invoke the APA's judicial review provisions, he must establish that he is proceeding against an "agency" and that he is challenging a "final agency action." 5 U.S.C.A. §§ 701, 704. Plaintiffs have asserted APA claims against both ACGIH and the federal defendants. ACGIH contends that Plaintiffs' claims must be dismissed for failure to state a claim both because ACGIH is not an "agency." The federal defendants, on the other hand, do not dispute that they are agencies and, as such, are amenable to suit under the APA. Instead, they maintain that Plaintiffs have not identified a "final" agency action, therefore failing to state a cognizable claim.

### 1. APA Claim Against ACGIH

#### a. *Is ACGIH an "Agency" for APA Purposes?*

■ The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C.A. §§ 551, 701. Aside from this definition, and certain statutory exceptions that are inapplicable here, the statute provides no further elaboration on the matter. ACGIH argues that it should not be considered an agency for the following reasons. First, it is a private, professional society composed of practitioners in the fields of industrial hygiene and occupational health. Second, it does not receive government funding. Third, no government agency or other governmental entity was involved in its creation. And, finally, it is not controlled or managed by, and takes no direction from, the federal government. *See* ACGIH's Mot. to Dismiss, tab 33, at 5.

In response, Plaintiffs argue that ACGIH is a *de facto* agency of the federal government, and therefore falls within the APA's coverage. As authority for this position, Plaintiffs cite language from *In re Gideon*, 158 B.R. 528, 531 (Bankr.S.D.Fla. 1993), in which the court found there to be an "ambiguity and uncertainty regarding the interpretation of the term 'authority of the Government of the United States.'" The court then identified three criteria it considered useful for determining whether an entity is an agency under the APA: (1) whether it has authority to act with the sanction of government support; (2) whether it has any authority in law to make decisions; and (3) whether it has substantial authority in the exercise of specific functions. *Id.*

The Court has closely considered *In re Gideon* and the cases cited therein, *see Soucie v. David*, 448 F.2d 1067 (D.C.Cir. 1971); *Grumman Aircraft Eng'g Corp. v. Renegotiation Board*, 482 F.2d 710 (D.C.Cir.1973); *Washington Research Project v. Dep't of Health, Education and*

*Welfare,* 504 F.2d 238 (D.C.Cir.1974); *Ellsworth Bottling Comp. v. U.S.,* 408 F.Supp. 280 (W.D.Okl.1975); *Public Citizen Health Research Group v. Dep't of Health, Education and Welfare,* 449 F.Supp. 937 (D.D.C.1978); *Conservation Law Foundation v. Harper,* 587 F.Supp. 357 (D.Mass.1984), and concludes that, even taking Plaintiffs' allegations as true, ACGIH cannot be considered an agency of the federal government.

In each of the cases cited above, the party sought to be labeled as an agency under the APA was first recognized as being a governmental entity. *Soucie,* 448 F.2d at 1073 (noting that the Office of Science and Technology was created by the President's executive reorganization plan); *Grumman,* 482 F.2d at 716 (noting that the Renegotiation Board was established by Congress); *Washington Research Project,* 504 F.2d at 246 (noting that Initial Review Groups were created by the National Institute of Mental Health, a division of the Department of Health, Education and Welfare); *Ellsworth,* 408 F.Supp. at 282 (finding that the Army and Air Force Exchange Service was a modern day "post exchange" and recognizing that post exchanges were deemed "arms of the government" because they were created by regulations promulgated by the Secretary of War); *Public Citizen,* 449 F.Supp. at 939 (finding that the National Capital Medical Foundation was designated a Professional Standards Review Organization by, and operated under contract with, the U.S. Department of Health, Education, and Welfare); *Harper,* 587 F.Supp. at 362 (noting that the Property Review Board was created by Executive Order). Only after first concluding that the group or organization in question was a governmental entity—either by express creation of the federal government or by virtue of its contractual relationship to the federal government—did the courts move on to the determinative inquiry: whether the governmental entity exhibited the types of characteristics sufficient to be considered an agency of the government. While this inquiry is necessarily fact intensive, contrary to Plaintiffs' suggestion, it is not a "question of fact" in the usual sense of that phrase, requiring that its resolution should be left to a jury. In no instance has a court held a party to be an agency under the APA without first recognizing it as a governmental entity.

The allegations pleaded by Plaintiffs do not demonstrate that ACGIH is a governmental entity. Though Plaintiffs allege that ACGIH was created by *officials* of the federal government, they do not identify any particular statute, order, regulation or other similar legislative action that would support the view that ACGIH is a governmental creation. Similarly, Plaintiffs have not alleged that ACGIH owes any contractual obligations to the federal government. The Court therefore finds that ACGIH is not an agency under the APA. Accordingly, the APA claim against ACGIH is dismissed.

### 2. APA Claims Against the Federal Defendants

As noted above, the federal defendants do not and cannot dispute the fact that they are "agencies" within the meaning of the APA. They do, however, maintain that Plaintiffs' APA claims should be dismissed for failing identify a "final" agency action and because ACGIH is not an advisory committee under FACA.

### a. Has There Been a "Final Agency Action"?

 Other than agency action made reviewable by statute, only "final agency

action" is subject to judicial review under the APA. *See* 5 U.S.C.A. § 704. Judicial review of final agency action is proper when there is no other adequate remedy available in court. As the Supreme Court has noted, the word "action" in this context is meant "to cover comprehensively every manner in which an agency may exercise its power," *Whitman v. American Trucking Assoc.*, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), and is not particularly problematic. The word "final" carries more significance, and the Supreme Court has held that:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *see also Tennessee Valley Authority v. Whitman*, 336 F.3d 1236, 1248 (11th Cir.2003).

Plaintiffs allege that, upon publication, the TLVs adopted by ACGIH become exposure levels with the force and effect of law as a result of the incorporation-by-reference provision of OSHA's Hazard Communication Rule. *See* 29 C.F.R. § 1910.1200. Further, Plaintiffs assert that the transformation of TLVs into legally enforceable safety standards triggers numerous regulatory requirements with which Plaintiffs must comply, including labeling hazardous materials and warning employees about their exposure to such materials.

The federal defendants argue that these allegations fail to show a final, reviewable action has been taken. Although not pleaded in one succinct allegation, it is fair to infer from the totality of the complaint that the final action challenged here is the federal defendants' decision, expressed in the Hazard Communication Rule, to rely on the TLVs as evidence that a listed substance presents a hazard to workplace safety. More simply, it is their *reliance* on the TLVs that constitutes a final agency action. Such reliance could be considered to meet the Supreme Court's definition of "action" because it is one "manner in which an agency may exercise its power." Moreover, it can be considered final for purposes of the APA because using TLVs as a safety indicator of substances found in the workplace represents the consummation of ACGIH's decision-making process and imposes certain obligations from which legal consequences flow. The decision to use ACGIH's TLVs as a reference is not tentative or interlocutory.

This determination says nothing about whether the federal defendants' have acted unlawfully, nor does it otherwise speak to the merits of the APA claim. Rather, it merely constitutes a threshold finding by the Court that Plaintiffs' may proceed to discovery on this claim.

**b. *Does FACA Apply to ACGIH?***

■ Because an APA claim must be premised on an underlying legal violation, there can be no basis for finding that the federal defendants' reliance on the TLVs is "not in accordance with law" or "without observance of procedure required by law" unless Plaintiffs are able to demonstrate that ACGIH is subject to FACA. This is because it is ACGIH's alleged FACA violations that provide the foundation for Plaintiffs' APA claim against the federal defendants. Section 4 of FACA states that

"[t]he provisions of this Act shall apply to each advisory committee." 5 U.S.C.A.App. 2 § 4. For ACGIH to be bound by the statute's requirements, then, it must meet the definition of "advisory committee," which reads as follows:

> (2) The term "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other such subgroup thereof (hereafter in this paragraph referred to as "committee"), which is—
>
> . . . . .
>
> (C) *established* or *utilized by* one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government.

5 U.S.C.A.App. 2 § 3 (West 1996) (emphasis added). Subsection (2)(C) is the relevant provision in this case, as Plaintiffs claim that ACGIH was either "established" by a federal agency or is "utilized by" a federal agency.

■ An advisory group is "established" by an agency for FACA purposes "only if it is actually formed by the agency." *Byrd v. U.S. E.P.A.*, 174 F.3d 239, 245 (D.C.Cir. 1999) (citation omitted). Plaintiffs assert that "ACGIH was *established* at the request of and *by federal agencies* and officials with the convening of the National Conference of Governmental Industrial Hygienists." (emphasis added) Pls.' Am. Compl., tab 24, at 12. Plaintiffs' amended complaint contains no further factual support for this allegation, however. Though the Court must accept well-pleaded factual allegations as true for purposes of a motion to dismiss, it is not bound to give credence to conclusory allegations. *See Oxford Asset Management, Ltd. v. Jahar-*

*is*, 297 F.3d 1182, 1188 (11th Cir.2002). Accordingly, to the extent that Plaintiffs premise their ABA claim on the unsupported allegation that ACGIH was established by a federal agency, the Court finds that Plaintiffs have failed to satisfy the requisite showing under the "established" prong of subsection (2)(C).

With respect to the "utilized by" prong of this subsection, it is well settled that the word "utilized" is not to be given a literal construction. *See Public Citizen*, 491 U.S. at 452, 109 S.Ct. 2558; *see also Miccosukee*, 304 F.3d at 1085. In *Public Citizen* the Supreme Court recognized that " '[u]tilize' is a wooly verb, its contours left undefined by the statute itself." *Id.* The Court reasoned that if "utilized" were read without qualification, FACA's reach would sweep far more broadly than Congress could have intended. *Id.* After conducting a lengthy review of the legislative history leading up to FACA's passage, the Supreme Court in *Public Citizen* concluded that the requirements imposed on advisory committees by the statute did not apply to the American Bar Association's Standing Committee on the Federal Judiciary. *Id.* at 465, 109 S.Ct. 2558. The Court reached this conclusion by finding that the Committee was not utilized by the President or the Department of Justice. However instructive *Public Citizen* is in terms of explaining FACA's overall purpose, the Court did not set out a bright-line test or set of principles against which to assess whether a particular entity is utilized by a federal agency.

The U.S. Court of Appeals for the District of Columbia Circuit has decided a handful of cases interpreting the "utilized" prong of § 3(2)(C). *See Byrd v. U.S. E.P.A.*, 174 F.3d 239 (D.C.Cir.1999); *see also Animal Legal Defense Fund, Inc. v.*

*Shalala,* 104 F.3d 424 (D.C.Cir.1997); *Washington Legal Foundation v. U.S. Sent. Comm'n,* 17 F.3d 1446 (D.C.Cir. 1994); *Food Chem. News v. Young,* 900 F.2d 328 (D.C.Cir.1990). In *Young* the court held that the term " 'utilized' encompasses a group organized by a nongovernmental entity but nonetheless so 'closely tied' to an agency as to be amenable to 'strict management by agency officials.' " 900 F.2d at 332–33. In *WLF* the court observed that the word "utilized" contemplates "a stringent standard, denoting something along the lines of actual management or control of the advisory committee." 17 F.3d at 1450. Finally, the court noted in *Byrd* that "participation by an agency or even an agency's 'significant influence' over a committee's deliberations does not qualify as management and control such that the committee is utilized by the agency under FACA." 174 F.3d at 246. No court in the Eleventh Circuit appears to have taken a differing view.

As support for the contention that ACGIH is "utilized" by federal agencies, Plaintiffs allege that "federal agencies housed, staffed and funded ACGIH for the majority of its existence;" that officials of the federal defendants "hold important positions in the ACGIH leadership and in the ACGIH bodies that request, review, formulate propose and adopt TLVs;" that the federal defendants provide "funding for ACGIH Committee and Board Members' participation and meetings;" and that ACGIH's Board of Directors is partially composed of officials of the federal defendants and that those board members "coordinate ACGIH actions." Pls.' Am. Compl.,tab 24, at 4–5. For these reasons, Plaintiffs assert that "ACGIH TLVs are controlled, managed and/or subject to management and heavily influenced by officials of HHS, DOL, and other federal

departments and/or entities." Pls.' Am. Compl., tab 24, at 5.

While the Court expresses no opinion about whether ACGIH is in fact "utilized by" the federal defendants as contemplated by FACA, it finds that Plaintiffs' pleadings are sufficient to defeat a motion to dismiss for failure to state a claim.

**C. COUNT III: Uniform Deceptive Trade Practices Act**

Plaintiffs allege that ACGIH has engaged in deceptive trade practices in violation of Georgia's Uniform Deceptive Trade Practices Act ("UDTPA"), O.C.G.A. § 10–1–372 (Lexis 2000). The UDTPA makes certain types of conduct unlawful when carried out in the course of a person's "business, vocation, or occupation." Plaintiffs assert that, by adopting TLVs which are not scientifically justified, ACGIH (1) "represents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;" (2) "disparages the goods, services, or business of another by false or misleading representation of fact;" and (3) "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." O.C.G.A. § 10–1–372(a)(7), (8), and (12). To trigger the statute's operation, Plaintiffs allege that "ACGIH is in the business, among others [sic], of publishing, selling and disseminating its occupational workplace TLV standards and related materials." Pls.' Am. Compl., tab 24, at ¶ 100.

After reviewing the relevant case law on this issue, it does appear that Plaintiffs have asserted a novel claim under the UDTPA. However, the Court is unable to conclude from the facts alleged in the

amended complaint that Plaintiffs have failed to state a claim. Consequently, this claim may proceed to discovery, as Plaintiffs have met the minimal burden necessary to defeat ACGIH's 12(b)(6) motion.

### D. COUNT IV: Tortious Interference with Contractual/Business Relations

To state a claim for tortious interference with contractual relations, business relations, or potential business relations, Plaintiffs must plead facts to support the following elements: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Dalton Diversified, Inc. v. AmSouth Bank,* 270 Ga.App. 203, 605 S.E.2d 892, 897–98 (2004). The Court is satisfied that Plaintiffs have alleged sufficient facts to support the first, second, and fourth elements of this claim. However, with respect to the third element—the requirement that a defendant has *induced* a breach of contractual obligations or has *caused* a party to discontinue or fail to enter an anticipated business relationship—the Court finds that the allegations are insufficient to withstand ACGIH's 12(b)(6) motion.

Plaintiffs allege that "ACGIH's interference diminished, hampered, and/or entirely prevented Plaintiffs' business relations with third parties." Pls.' Am. Compl., tab 24, at ¶ 113. Plaintiffs, however, provide no factual support for this conclusory assertion. Instead, Plaintiffs assert that "many of those with whom Plaintiffs currently conduct business will discontinue their relations ... as products become too expensive or unavailable" and that "those who otherwise might have conducted business with Plaintiffs in the future will never form such relationships." According to the amended complaint, Plaintiffs' diminished sales "are a certainty" based on "actual experience" and the "laws of economics." Pls.' Am. Compl., tab 24, at ¶¶ 110, 113. Plaintiffs also count "litigation costs" and "liability risks" among the injuries to be sustained from ACGIH's tortious interference. Pls.' Am. Compl., tab 24, at ¶ 113. Finally, Plaintiff IBSA alleges that one of its members "reasonably anticipates" that vendors will "no longer sell or use [its] products because of perceived serious health concerns" stemming from ACGIH's TLVs. Pls.' Am. Compl., tab 24, at ¶ 116.

These allegations do not contain sufficient facts to sustain a claim for tortious interference. Plaintiffs seek to be compensated for unsubstantiated, speculative economic injury that has yet to occur. This tort requires a plaintiff to show that the defendant *induced* a breach of contract or *caused* a lost business relationship that resulted in a harm to the plaintiff. Plaintiffs have not alleged one instance in which either of these events has in fact happened. This is not to say that future losses cannot be compensated. But with respect to the charge that prospective business relationships will not develop, Plaintiffs have not alleged that such relationships would have formed in the absence of ACGIH's adoption of the TLVs in question. "In order to establish a cause of action for interference with prospective business relations, the plaintiff must establish that absent the interference, *those re-*

*lations were reasonably likely to develop in fact."* Camp v. Eichelkraut, 246 Ga. App. 275, 539 S.E.2d 588, 595 (2000) (emphasis added). Plaintiffs have failed to do so. In addition, the allegations concerning the threat of increased litigation costs and liability risks do not relate to a particular contract or business relationship. For these reasons, Plaintiffs have failed to state a claim against ACGIH for tortious interference.

### E. COUNT V: OSHA's Hazard Communication Rule Incorporation by Reference of ACGIH's TLVs

■ Plaintiffs allege in Count V that federal law prohibits the Department of Labor, acting through OSHA, from using its Hazard Communication Rule, 29 C.F.R. § 1910.1200, to incorporate by reference "prospective versions or editions of publications or standards—such as the 2005 TLVs—into the Code of Federal Regulations." Pls.' Brief in Resp. to Fed. Defs.' Mot. to Dismiss, tab 66, at 23; *see* Pls.' Am. Compl., tab 24, at ¶¶ 118–121. The Rule was promulgated pursuant to the Occupational Health and Safety Act ("OSH Act"), 29 U.S.C.A. § 651 *et seq.* (1999). Plaintiffs assert that the Rule violates the Federal Register Act, the Paperwork Reduction Act, and the Due Process Clause of the Fifth Amendment.

Defendant responds by noting that under the OSH Act Plaintiffs' objection to the incorporation-by-reference provision of the Hazard Communication Rule is time-barred and that, even if it were not, this Court is not the proper forum in which to bring such a claim. The judicial review component of the OSH Act provides, in pertinent part: "Any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard." 29 U.S.C.A. § 655(f) (West 1999). The Hazard Communication Rule was first promulgated in 1983 and was last amended in 1996.

Plaintiffs, in an attempt to avoid these jurisdictional hurdles, maintain that they are not challenging the Rule itself but merely "seek[ing] declaratory relief from a clearly improper and unlawful prospective incorporation by reference of ACGIH's TLVs." Pls.' Brief in Opp'n to Defs.' Mot. to Dismiss, tab 66, at 22. In the Court's view, however, because the incorporation-by-reference provision of which Plaintiffs complain is part of OSHA's Hazard Communication Rule, it is reasonable to conclude that any challenge to that provision should be treated as a claim attacking the validity of the Rule itself. Plaintiffs cannot argue on one hand that a specific provision of the Rule is unlawful (thus making the TLVs unenforceable) while on the other hand maintaining that they are not in fact "challenging" the Rule. The Court therefore construes Plaintiffs' allegations under the Federal Register Act, the Paperwork Reduction Act, and the Due Process Clause of the Fifth Amendment as alternative methods for attacking the validity of the Hazard Communication Rule. Accordingly, because the 60–day time limit for seeking judicial review has long since past and this Court is not the proper court to hear such a challenge, Plaintiffs' claims are jurisdictionally barred by § 655(f) of the OSH Act.

### F. THE FIRST AMENDMENT

■ Defendants have made a First Amendment argument which the Court

feels compelled to address before concluding. The First Amendment doctrine of prior restraints played a large in role in Judge Lawson's previous Order denying Plaintiffs' request for preliminary injunctive relief—and for good reason. At issue there was Plaintiffs' attempt to prevent ACGIH from taking *any action* on the proposed TLVs at its annual board meeting which was set to take place only a few days after oral argument on the TRO motion. Plaintiffs wanted the Court to prevent ACGIH from engaging in a speech-related activity before such activity commenced. That request provided a classic example of an impermissible prior restraint—*i.e.* the government enjoining speech before it occurs.

At this stage of the lawsuit, however, the protected speech activity has already occurred. Thus, the gravamen of Plaintiffs' challenge is different. Plaintiffs are now primarily concerned with the allegedly illegal enforcement of the TLVs by the federal government. Seeking an injunction to prevent the government from enforcing the challenged safety standards does not, in the Court's view, implicate the prior restraints doctrine as before. Therefore, the Court does not see fit to engage in an extensive discussion of the topic.

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and DENIES in part Defendants' motions, hereby:

1. **DISMISSING** Plaintiffs' FACA claims (Count I) against all Defen-
dants for lack of jurisdiction under 12(b)(1);

2. **DISMISSING** Plaintiffs' APA claim (Count II) against ACGIH for failure to state a claim upon which relief may be granted under 12(b)(6);

3. **DISMISSING** Plaintiffs' tortious interference claim (Count IV) against ACGIH for failure to state a claim upon which relief may be granted under 12(b)(6); and,

4. **DISMISSING** Plaintiffs' claims against the federal defendants (Count V) for violations of the Federal Register Act, the Paperwork Reduction Act, and Due Process Clause of the Fifth Amendment for lack of jurisdiction under 12(b)(1).

As a result of the Court's ruling, the following claims may proceed to discovery:

1. Plaintiffs' APA claim against the federal defendants (Count II);

2. Plaintiffs' claim against ACGIH for violations of the Uniform Deceptive Trade Practices Act (Count III);

SO ORDERED.