A04A2344. DALTON DIVERSIFIED, INC. v. AMSOUTH BANK.
(605 SE2d 892)

ELDRIDGE, Judge.

Dalton Diversified, Inc. appeals from the grant of a judgment notwithstanding the verdict and in the alternative the grant of a new trial on a breach of contract claim. Finding that one essential element in each of the claims for conversion, trespass, tortious interference with contractual relations, tortious interference with business relations, and breach of contract was not proven, the grant of j.n.o.v. as to such claims is affirmed. The issue of the alternative grant of a new trial on grounds of an excessive verdict is moot; furthermore, the verdict as to each theory of liability was excessive, because the appropriate legal measure of damages was not used and an unauthorized accounting method was used instead.

On February 8, 1999, AmSouth Bank the successor to Pioneer Bank entered into "The Business Manager Agreement with Businesses and Professionals" with Diversified, which provided that AmSouth could, at its "sole option and discretion," purchase accounts receivable up to a $350,000 advance with any repurchase or other obligations owed by Diversified to AmSouth being secured by the receivables and other specified property. AmSouth could require, but was not required to allow, Diversified to repurchase all or any portion of the receivables, under certain conditions including age of 120 days uncollected. The Agreement vested "absolute right, title and ownership of [the] Receivables . . . in the Bank," and Diversified had "no

right to reacquire, redeem or otherwise obtain title to the Receivables or any proceeds thereof." Further, Diversified granted to AmSouth a security interest in all Diversified's present and future accounts, instruments, contract rights, chattel paper, documents and general intangibles and all proceeds, including the funds held in a so-called "Reserve Account." As an essential term of the agreement, Diversified warranted to AmSouth that the Receivables were bona fide and existing obligations owed to Diversified free of any deduction, offsets, defense, counterclaim, or dispute. Upon the occurrence of a default, Diversified agreed that AmSouth had the right to immediately terminate the Agreement and to withhold any further payments to Diversified. In the Agreement, Diversified released AmSouth from any liability for indirect, special, or consequential damages such as loss of anticipated revenues, and damages were limited to "THE AMOUNT OF THE SERVICE CHARGE PAID BY THE BUSINESS TO THE BANK DURING THE PRECEDING TWELVE (12) MONTH PERIOD." Section 11 of the Agreement acknowledged and agreed that the Agreement constituted the parties' entire agreement and could not be modified or amended except in writing. Also, AmSouth had a UCC-filed security interest in Diversified's accounts receivable. Upon the daily delivery of accounts receivable from Diversified, AmSouth approved the receivables and credited Diversified's operating account ninety percent of the factored amount and ten percent deposited to the reserve account, less fees. Diversified's practice was to fax invoices to Chattanooga daily and later deliver the pink invoice copy to AmSouth.

By June 1999, several dozen accounts receivable/invoices, totaling $165,081.25 for Shaw Industries had been credited to Diversified's operating account by AmSouth but were questioned by Shaw and were uncollectible, because Shaw had no record of such sales and deliveries and disputed the invoices, refusing to pay the invoices. Merle T. Haymes, Jr., Diversified's CPA, admitted upon cross-examination that there were problems with invoices to Shaw in March and April 1999. Baker, the president of Diversified, admitted to AmSouth that one or more invoices may have been sent in by error after they had been paid. Amber Holland, Shaw's employee, testified that Shaw and not AmSouth placed a hold on Diversified's account, because there was a problem with Diversified's invoices. AmSouth collected the accounts receivable from Diversified's customers. Had there been no problem for AmSouth collecting the Shaw invoices, then the $165,081.25 would have been timely collected by AmSouth. On September 9,1999, the reserve account had only $5,534.56 in it. On September 29, 1999, AmSouth was owed $165,081.25 for uncollectible accounts receivable and charged off the balance of Diversified's funds held of $15,905. When a debt was owed, AmSouth did not

release its security interest until the debt was paid, which was normal banking practice.

Diversified was a niche industrial hardware supplier to the Dalton carpet industry and provided supplies that other suppliers in the immediate area could not furnish. Diversified had grown rapidly over four years. Diversified was among the suppliers in the area who supplied carpet manufacturers: Shaw, Mohawk, Beaulieu, Collins & Aikman, and J & J. Ten carpet plants in the Dalton area produced eighty percent of the hardware business. Haymes took into consideration overhead and expenses but never testified as to such costs; nor was evidence of total overhead and cost of goods ever introduced into evidence. In 1998, the taxable income was approximately $160,000. The cash flow approach did not accurately reflect all the expenses, debt service, and interest that had to be paid each year by Diversified. In April and May 1999, Diversified had only a marginal cash flow. Baker had begun to have mental health problems that affected his ability to handle a growing company. By mid-1998, suppliers were being paid late, and inventory was not expanded as a reserve for immediate delivery in a crisis.

In early 1999, the Georgia Community Group ("GCG")/Frontier Trading was contacted about investing, making a loan, and managing Diversified, because Diversified was in trouble on many fronts. Diversified owed banks between $600,000 and $700,000 and owed its suppliers thousands of dollars on unpaid accounts; some suppliers had cut off Diversified for nonpayment of its bills; Diversified had only $200 in its account. GCG was not aware that Diversified on April 12, 1999, had $53,000 and on April 29, 1999, $22,000 in questioned invoices for Shaw. Diversified was not making a profit and had lost sales and money. On May 21, 1999, GCG determined that Diversified needed to borrow $250,000 from it and put in $84,000 into Diversified's operating account.

On May 21, 1999, GCG entered into a management agreement with Diversified, and the principals of GCG, Alton Wagnor and Phil Foster, were appointed as officers of Diversified. GCG determined that Diversified was losing money. Diversified had declining sales throughout 1999. Because of the general economy, the carpet industry had a volatility in sales volume with ups and downs. Acquiring inventory and maintaining it as well as delivery upon request capability were major factors as to maintaining and growing Diversified's business. In Foster's opinion, Diversified had lacked the inventory and ability to get inventory from manufacturers or suppliers.

Foster testified that GCG tried to help run Diversified for four weeks by putting in money, reestablishing suppliers who would ship on credit, and building inventory; but after two weeks, the problems with AmSouth caused GCG to quit putting money into a losing

venture. GCG, itself, had to pay some suppliers who had cut Diversified off to get the inventory restarted. In July 1999, when GCG got out, it was owed $84,000, which it never got back; GCG never loaned Diversified the balance of the $250,000. In July, GCG backed out of the management of Diversified. GCG started getting suppliers to reestablish lines by assuring them of payment with its own credit and was able to get all suppliers back after making partial payment on accounts and establishing payment schedules.

Instead of daily taking invoices to AmSouth, GCG took the Diversified invoices every ten days, but these invoices were never factored by AmSouth. During the second week, GCG learned that a check to a supplier had bounced, and Foster covered the check with his personal check. When other checks began to bounce, Foster did not personally replace the check with his own check. The next day, Foster went to AmSouth and tried to personally guarantee that all Diversified's outstanding checks would clear but put no money into Diversified's account to cover the checks; AmSouth refused, and all of the checks bounced. AmSouth refused to allow either Wagnor or Foster to guarantee the bounced checks and disputed invoices, because AmSouth did not want to reinstate the Agreement. The day after Foster went to AmSouth about the bounced checks, he was informed that the Agreement was terminated, because Diversified had defaulted on the Agreement as involving fraudulent invoices. No prior notice was given that the Agreement was being terminated. Diversified had defaulted on the Agreement, and AmSouth terminated the Agreement because Diversified was a problem account and was suspected of engaging in fraud. AmSouth terminated the management account and did not process $60,000 to $70,000, of which $50,000 to $55,000 would have gone to the operating account from new invoices and which caused the $30,000 in checks to bounce. Foster learned that AmSouth would no longer buy Diversified's invoices. The suppliers with the bounced checks again cut Diversified off. In the face of a history of nonpayment, the bounced checks ruined Diversified's reestablished relationship with the suppliers. When Wagnor and Foster learned from AmSouth that the invoices delivered to it were not being credited to Diversified's operating account but being held, they did not ask for the immediate return of the invoices; however, ten days later, AmSouth returned the invoices to them. AmSouth never told either Wagnor or Foster of the problems with false invoices.

On August 13, 1999, the Premier Bank/Dalton Whitfield Bank ("Premier") entered into another business management program with Diversified, which was similar to the AmSouth Agreement. In August 1999, such second management agreement account began. Premier knew that, when it entered into the management agreement

with Diversified, AmSouth continued to hold a security interest in Diversified's receivables. AmSouth gave to Premier the requested payoff sum that Diversified owed AmSouth under the Agreement. Premier never paid off AmSouth, because Baker told Premier that Diversified disputed the amount due to AmSouth. On October 19, 1999, Shaw notified Premier that an invoice was claimed by AmSouth. Shaw paid $75,900 of outstanding invoices to Premier. Without the release of the UCC by AmSouth, Premier could not continue to fund its management program, because it did not have a first security interest.

In November 1999, Diversified ceased operations, and AmSouth, as secured lender, took the remaining assets.

1. Diversified contends that the trial court erred in granting j.n.o.v. on its contract claim because no motion for directed verdict had been made.

Diversified's statement of fact cited to the transcript where AmSouth made a motion for directed verdict on the other theories of liability and sets this out as error in the granting of j.n.o.v.; however, Diversified never makes any argument, either by citation to the record or by providing authority that the trial court's grant of j.n.o.v. on the contract claim was error. In fact, Diversified makes a consolidated argument as to all seven of its enumerated errors without specific argument as to the issue of no motion for directed verdict on the contract claim being made or that there was a valid contract claim.

> It is not the function of this court to cull the record on behalf of a party in search of instances of error. The burden is upon the party alleging error to show it affirmatively in the record. Because [the appellant] has not set forth any specific enumerations of error, let alone tried to support them with proper citations to the record and legal authorities, there is nothing for us to review.

(Punctuation and footnotes omitted.) *Dwyer v. Mtg. Electronic Registration Systems*, 258 Ga. App. 220 (573 SE2d 489) (2002). Therefore, such issue is deemed abandoned or waived. Court of Appeals Rule 27 (a) (3), (c) (2), (c) (3) (i). *Rental Equip. Group v. MACI, LLC*, 263 Ga. App. 155, 163 (3) (587 SE2d 364) (2003); *Welch v. State*, 263 Ga. App. 70, 72 (3) (587 SE2d 220) (2003).

2. Diversified contends that the trial court erred in granting j.n.o.v. on its conversion claim.

The property that Diversified contends AmSouth converted was never specified, pled, nor specifically pointed out in the evidence as the property converted, but it appears to be the invoices of $165,081.25

not credited to Diversified's operating account at the time of termination of the Agreement, which were subsequently returned to Diversified. Under Agreement Sections 2.1, 3.3 and 5.2, AmSouth had the absolute right and title to all Diversified's invoices as receivables and could retain such receivables.

To make out a prima facie case of conversion, Diversified had to prove its title to the property, possession in AmSouth, demand by Diversified for return of the property, and refusal without justification by AmSouth to return such property. *Taylor v. Powertel*, 250 Ga. App. 356, 358 (2) (551 SE2d 765) (2001). The evidence fails to support each such element so that j.n.o.v. was demanded as a matter of law, because AmSouth had the right of possession of the invoices and Diversified had no such right of possession.

3. Diversified contends that the trial court erred in granting j.n.o.v. on the trespass claim.

Under OCGA § 51-10-3, Diversified failed to prove "[a]ny unlawful abuse of or damage done to the personal property of another constitut[ing] a trespass for which damages may be recovered," because again, Diversified could not prove the ownership, title, or right of possession of the invoices for a security interest under the Agreement which vested the title and right of possession in AmSouth. *Maryland Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 260-261 (1) (356 SE2d 877) (1987). Until all debts owed to AmSouth by Diversified were paid in full, AmSouth possessed a valid security interest allowing it to hold all invoices of Diversified that came into its possession. OCGA § 11-9-404 (current act OCGA § 11-9-513). The grant of j.n.o.v. on this claim was proper.

Further, since the jury returned a verdict under both conversion and trespass theories for the same personal property damage and in the same amount, then this constituted an illegal double recovery. See *Belle Isle v. Moore*, 190 Ga. 881, 885 (3) (10 SE2d 923) (1940).

4. Diversified contends that the trial court erred in granting j.n.o.v. on the tortious interference claims.

(a) AmSouth, pursuant to its rights under the Agreement with Diversified, was not a stranger to the contract between Diversified and GCG, because the Diversified-GCG agreement, as a management, investment, and loan agreement was subordinate to the recorded security interest and management agreement of AmSouth and Diversified so that AmSouth was privileged and had an interest in the Diversified-GCG agreement.

> The elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and

with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

(Citations and footnotes omitted.) *Blakey v. Victory Equip. Sales*, 259 Ga. App. 34, 38 (2) (d) (576 SE2d 288) (2002).

"The exercise of an absolute legal right is not and cannot be considered an interference with a contractual or potential contractual relationship," because privilege means legitimate economic interests of the defendant or a legitimate relationship of the alleged interloper or meddler to the contract. *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 741-742 (492 SE2d 526) (1997). Thus, if the defendant has a legitimate economic interest in either the contract or a party to the contract, then the defendant is not a stranger to the contract and acts with privilege. Id. at 741. The actions by a secured creditor exercising its contractual rights do not constitute the wrongful improper conduct necessary for this tort action; for liability, the defendant must have "acted improperly and without privilege." (Citations omitted.) *Russell Corp. v. BancBoston Financial Co.*, 209 Ga. App. 660, 663 (4) (434 SE2d 716) (1993). The defendant "must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract" for the conduct to be tortious interference. (Citation and punctuation omitted.) *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 291 (3) (f) (520 SE2d 517) (1999). Where a defendant has a financial interest in one of the parties to the contract or in the contract, the defendant is not a stranger to the contract or business relationship, even though it is not a signatory to the contract. *Renden, Inc. v. Liberty Real Estate, Ltd. Partnership III*, 213 Ga. App. 333, 336 (2) (b) (444 SE2d 814) (1994). To be liable for tortious inference to a contract or a business relationship, the defendant must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract; thus, all parties to an interwoven contractual arrangement cannot be liable for tortious interference with any of the contracts or business relationships that underlie such contractual arrangement. *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 609 (2) (503 SE2d 278) (1998); see also *Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting &c.*, 205 Ga. App. 57, 60 (1) (421 SE2d 295) (1992).

(b) AmSouth through its security interest, the Agreement, and creditor relationship with Diversified, had a privileged relationship with the Diversified-Premier management agreement so that it was not a stranger to the contract and business relationship.

The security interest of AmSouth in the receivables of Diversified was superior to the Premier management agreement and security interest so that its legitimate economic interest prevented it from being a stranger, interloper, or meddler to the Diversified-GCG management agreement even though it was not a party to that contract; "[p]arties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." (Footnote omitted.) *LaSonde v. Chase Mtg. Co.*, 259 Ga. App. 772, 773 (1) (577 SE2d 822) (2003). AmSouth's actions or inactions regarding its security interest did not, as a matter of law, constitute a tortious interference. *Disaster Svcs. v. ERC Partnership*, supra at 741-742. AmSouth had the right to retain such security interest until all debts owed to it were paid or compromised.

(c) Through the Agreement, AmSouth had Diversified's invoices from Shaw Industries, both legitimate and disputed, which prevented it from being a stranger to Shaw-Diversified's transactions. *Disaster Svcs. v. ERC Partnership*, supra at 741-742. Further, there was no evidence that AmSouth took any action regarding Shaw other than its right to collect accounts receivable from Shaw issued by Diversified. It was Shaw that placed a hold on Diversified's invoices being paid to either AmSouth or Premier.

5. Diversified contends that the trial court erred in granting a new trial on the claim for breach of contract. Such issue is now moot in light of Division 1.

*Judgment affirmed. Ruffin, P. J., and Adams, J., concur.*

DECIDED OCTOBER 27, 2004.

*Davis, Kreitzer, Kemp, Joiner & Melton, John W. Davis, Jr., F. Gregory Melton,* for appellant.

*Miller & Martin, Geoffrey H. Cederholm, William A. DuPre IV, Sponcler & Tharpe, Henry C. Tharpe, Jr., Jones & Erwin, Anthony B. Erwin,* for appellee.