**ADVANCED TESTING TECHNOLO-
GIES INC., Plaintiff–Appellant,**

v.

**CDI CORPORATION, Pennsylvania
Corporation, M and T Company,
Defendants–Appellees.**

No. 15–11838

United States Court of Appeals,
Eleventh Circuit.

Date Filed: 09/23/2016

Andrew Jack Kochanowski, Sarah Lindsay Rickard, Kevin J. Stoops, Sommers Schwartz, PC, Southfield, MI, Daniel Bullard, IV, Erin S. Corbett, Kevin A. Wangerin, Bullard & Wangerin, LLP, Macon, GA, for Plaintiff–Appellant.

R. Daniel Beale, Dentons US, LLP, Atlanta, GA, for Defendants–Appellees.

Jeffrey Ronald Baxter, Dentons US, LLP, Atlanta, GA, for Defendant–Appellee CDI Corporation, Pennsylvania Corporation.

Cary Reid Burke, Dentons US, LLP, Atlanta, GA, for Defendant–Appellee M and T Company.

Before JORDAN and BLACK, Circuit Judges, and KALLON,* District Judge.

PER CURIAM:

Advanced Testing Technologies, Inc. appeals the district court's grant of summary judgment in favor of CDI Corporation and the M&T Company (collectively, CDI), in this tortious interference action. Exercising plenary review, *see Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002), and with the benefit of oral argument, we affirm.

---

* Honorable Abdul K. Kallon, United States District Judge for the Northern District of Alabama, sitting by designation.

## I

Because we write for the parties, we assume familiarity with the underlying facts of the case and recite only what is necessary to resolve this appeal.

ATTI and CDI are government defense contractors. ATTI's three counts of tortious interference—with contractual relations (Count I), business relations (Count II), and potential business relations (Count III)—share the same factual basis. ATTI alleged that the United States Air Force decided not to purchase seven newly redesigned Phase Noise Measurement Modules (PNMMs) from ATTI because Robert Buckley (a CDI engineer who previously worked at ATTI and who had been involved in the design of the PNMMs), led the Air Force to believe that the PNMMs that ATTI had sold to the Air Force in the early 1990s could be repaired to meet the calibration requirements of the Radar System Improvement Program (RSIP). ATTI asserted that Mr. Buckley was aware, from his employment at ATTI in 2007, that the existing PNMMs were not repairable because they could not be consistently calibrated to RSIP standards and were therefore unusable by the Air Force.

After the conclusion of briefing on CDI's motion for summary judgment, the district court held a telephone conference regarding one of CDI's assertions of undisputed fact, which stated as follows:

Mr. Buckley advised the Air Force that the PNMMs could not consistently test out to the particular -158dBc at 500 kHz noise floor (required by two of the Units Under Test), but he also advised the Air Force that a commercially-available device known as the Agilent E5052B could be used as a workaround to solve this problem. When used in combination with the Agilent E5052B ... Mr. Buckley believed that the existing PNMMs

would meet the remaining RSIP specifications.

D.E. 56 at ¶ 27. As summarized by the district court, "[a]t this conference, ATTI acknowledged that it had no basis for denying that [Mr.] Buckley made this disclosure," and, "[a]fter the conference, ATTI, in a letter to the Court, 'acknowledge[d] that several witnesses did generally testify that [Mr. Buckley] made a verbal suggestion ... of using the [Agilent] to augment the [PNMMs].' " D.E. 74 at 19.

In granting summary judgment for CDI, the district court concluded that there were no misrepresentations made by CDI (through Mr. Buckley) to the Air Force. "ATTI has based its claim almost entirely on the suggestion that [Mr.] Buckley told the Air Force he could fix the PNMMs without telling them that they could not measure the 158 without using the Agilent. But, as it turns out, it is undisputed that [Mr.] Buckley was upfront with the Air Force about this" and "the Air Force knew all along what [Mr.] Buckley was proposing . . . ." *Id.* at 20. The district court rejected what it perceived to be an attempt by ATTI in its post-conference letter to "offer up a new Buckley misrepresentation"—that Mr. Buckley did not explain to the Air Force the technical work and costs required to incorporate the Agilent workaround. *Id.* at 19. In addition, the district court concluded that there was no evidence the Air Force was misled by any material misrepresentations or omissions and that CDI was entitled to the fair competition privilege. *See id.* at 22.

ATTI argues the district court "missed that the '158' issue was not the only thing that [Mr.] Buckley knew was wrong with the PNMMs." Br. for Appellant at 36. "[J]ust as crucial," ATTI says, is that, "even if calibrated[,] the PNMMs could not *keep* calibration because of component degradation—and so they functioned *inter-*

*mittently." Id.* at 38. Accordingly, ATTI submits there are disputed issues of material fact that should be presented to a jury.

## II

To succeed on its tortious interference claims under Georgia law, ATTI must show "(1) improper action or wrongful conduct by [CDI] without privilege; (2) [that CDI] acted purposely and with malice with the intent to injure; (3) [that CDI] induced a breach of contractual obligations or caused [the Air Force] to discontinue or fail to enter into an anticipated business relationship with [ATTI]; and (4) [that CDI's] tortious conduct proximately caused damage to [ATTI]." *Tribeca Homes, LLC v. Marathon Inv. Corp.*, 322 Ga.App. 596, 745 S.E.2d 806, 808–09 (2013) (footnote call number and citation omitted). At bottom, ATTI's claims are based on the assertion that Mr. Buckley's alleged misrepresentations caused the Air Force not to buy its replacement PNMMs.

As noted, ATTI argues that there is a genuine issue of fact regarding whether Mr. Buckley misrepresented his ability to repair the PNMMs in light of "the intermittency issue." But, as we read the record, the district court correctly concluded that ATTI did not properly raise this theory of liability. *See* D.E. 74 at 20 n.16. Indeed, despite the parties' summary judgment briefing, the telephone conference regarding the critical question of what the evidence showed Mr. Buckley represented (or misrepresented) to the Air Force, and follow-up communications from the parties post-conference, it was still not clear to the district court whether ATTI was arguing that Mr. Buckley made a misrepresentation to the Air Force regarding the intermittency issue. Therefore, the district court saw fit to dispose of any suggestion of such an argument in a footnote. We have consistently rejected attempts by appellants to obtain reversal on a theory which was not properly asserted below, *see, e.g., Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998) (refusing to consider an argument not raised in the district court and observing that "[t]oo often our colleagues on the district courts complain that the appellate cases about which they read were not the cases argued before them"), and we see no reason to depart from this general rule here.

Even if we assume that ATTI created a genuine issue of material fact as to whether Mr. Buckley made misrepresentations, we nevertheless affirm the district court's grant of summary judgment in favor of CDI. We can affirm on any ground supported by the record, *see Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001), and CDI argues that there was a lack of evidence as to the element of inducement. *See* Br. for Appellees at 25–26. We agree with CDI about inducement, and without inducement there cannot be causation.

As the district court explained in its summary judgment order, the Air Force "was not being led blindly by [Mr.] Buckley." D.E. 74 at 22. The Air Force knew as early as 2007, and again in 2010, from ATTI's own statements and presentations that their PNMMs had deteriorated and that Mr. Buckley's work might have limitations. *See, e.g.,* D.E. 56 at ¶¶ 57–58, 64, 103–105.

Tortious interference is based on the premise that a defendant's false representation induced a third party to not do business with the plaintiff. It follows that there cannot be any liability if the third party to whom the defendant made the representation knew the representation was inaccurate and nevertheless still refused to do business with the plaintiff. In such a scenario, there is no causal nexus between the alleged misrepresentation and

the plaintiff's lost business opportunity. *See generally* RESTATEMENT (SECOND) OF TORTS § 547 (1977) ("[T]he maker of a fraudulent misrepresentation is not liable to another whose decision to engage in the transaction that the representation was intended to induce is not caused by his belief in the truth of the representation but is the result of an independent investigation made by him.").

Here, the Air Force was not satisfied with ATTI's claims that the existing PNMMs were beyond economic repair. *See* D.E. 52 at 46:1–7, 90:11–15, 92:21–93:8, 114:6–115:2, 116:13–22; D.E. 68 at 16:25–17:4. Given the Air Force's budgetary issues, trying to repair the existing PNMMs at an initial cost of $36,500, and a final cost of $135,000, *see* D.E. 56 at ¶¶ 88, 98, was simply "[a] lot more cost effective," D.E. 45 at 116:6, than buying additional new ones from ATTI at a cost of $3.2 million, *see* D.E. 59–3; D.E. 42 at 141:9–11. *See also* D.E. 45 at 64:9; D.E. 47 at 124:22–125:9; D.E. 49 at 94:14–18, 121:3–122:7.

Moreover, the Air Force was satisfied with the work Mr. Buckley performed. *See* D.E. 46 at 37:4–6; D.E. 49 at 118:25–119:7; D.E. 68 at 19:20–24, 74:4–7. And Mr. Buckley was up front about the need to use some workarounds for the PNMMs to achieve the desired level of operability. *See* D.E. 46 at 103:8–104:4; D.E. 47 at 137:9–138:7; D.E. 49 at 116:18–24, 122:8–24, 138:19–140:1; D.E. 50 at 44:15–45:14. Tellingly, when any Air Force witness was asked directly whether or not Mr. Buckley made any false representations as to his ability to repair the PNMMs, the answer was always "no." *See* D.E. 45 at 115:13–16; D.E. 46 at 37:7–14; D.E. 47 at 141:2–8; D.E. 49 at 122:8–24; D.E. 51 at 44:5–13; D.E. 52 at 117:8–16; D.E. 68 at 75:3–11, 77:17–25, 83:13–17. We note, as well, that although the Air Force did buy three new

PNMMs from ATTI in 2008, it never used them. *See* D.E. 51 at 32:9–11.

On this record, we conclude there is no triable issue of fact on the elements of inducement or proximate causation. ATTI has not created a jury question as to whether, but for Mr. Buckley's alleged misrepresentations, the Air Force would have bought the new PNMMs. *See, e.g., Smith v. Morris, Manning & Martin, LLP,* 293 Ga.App. 153, 666 S.E.2d 683, 694 (2008) ("We find that Smith and Premier cannot establish that the law firm's alleged actions interfered with their business relationship with Schoenbaum because they cannot establish that these actions influenced Schoenbaum's decisions in negotiating with Smith, leading him to offer Smith a ten percent profit participation, rather than the figure referenced in the pro forma."); *Tribeca Homes, LLC,* 745 S.E.2d at 808–09 ("And, any damage claimed to have been suffered by a plaintiff does not proximately result from the defendants' alleged misconduct, if the damage would have occurred notwithstanding their misconduct.") (internal quotation marks, footnote call number, and citation omitted).

### III

In sum, we affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**

BLACK, Circuit Judge, dissenting:

Rule 56 of the Federal Rules of Civil Procedure does not give a district court the discretion to grant summary judgment in favor of the party it believes will prevail. Summary judgment is appropriate only if there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a); *Lippert v. Cmty. Bank, Inc.,* 438 F.3d 1275, 1278 (11th Cir. 2006). I would reverse the grant of summary judgment on the basis that

genuine issues of material fact remain as to (1) whether Buckley misrepresented his ability to resolve the "intermittency issue," i.e., the inability of the PNMMs to keep calibration because of component degradation; and (2) whether Buckley's misrepresentations regarding the intermittency issue induced the Air Force to not do business with ATTI. Because I disagree with the majority's conclusion that ATTI waived the intermittency issue, and because I disagree with the majority's conclusion that no genuine issues of material fact remain, I respectfully dissent.

## I. BACKGROUND [1]

The United States Air Force operates a fleet of command and control aircraft known as the E–3 Sentry Airborne Warning and Control System (AWACS). The AWACS's most prominent feature is its large, rotating radar dome, which enables the AWACS to track ships and aircraft anywhere from the Earth's surface to the stratosphere. This sensitive radar equipment requires periodic testing to ensure that it continues to be calibrated in accordance with Air Force requirements.

In the 1990s, the Air Force developed an AWACS radar test system called the Benchtop Reconfigurable Automatic Tester (BRAT). ATTI, a private defense contractor, contributed numerous pieces of test equipment to the BRAT. Among ATTI's contributions to the BRAT is the phase noise measurement module (PNMM), which measures the phase noise sensitivity of 27 different pieces of radar equipment, known as units under test (UUTs). A PNMM tests the UUTs for compliance with mandatory specifications set forth in the Radar System Improvement Program (RSIP).

### A. Problems with the PNMMs

To verify that the UUTs continue to meet RSIP specifications, the PNMMs must be periodically calibrated. For many years, ATTI calibrated the PNMMs for the Air Force. Air Force personnel from Warner–Robins Air Force Base (AFB), Georgia, the primary operating location for the BRAT, would ship PNMMs to ATTI's facility in New York, where ATTI personnel would calibrate the PNMMs. In 2005, ATTI developed the Phase Noise Calibrator (PNC), which was designed to enable Air Force personnel to calibrate the PNMMs themselves, thereby obviating the need to ship the PNMMs to ATTI.

While developing the PNC, ATTI discovered problems with the PNMMs, which ATTI engineer Robert Spinner summarizes as follows:

> It became obvious that while the ... PNMM's self-test feature sometimes declared the unit ready, the units themselves could not properly test to the required RSIP specifications. And when the unit does from time to time test properly, it does so intermittently, such that it would be impossible to certify the unit as calibrated according to the [Air Force] schedule—one could not know whether the unit in fact was out of calibration a day or a month after the certification due to the intermittent nature of its operation.

1. The summary judgment evidence in this case is both voluminous and complex. In large part, this section paraphrases the order of the district court, which clearly expended a tremendous amount of time and effort understanding and summarizing the facts in this case. To avoid unnecessary complexity, this dissent includes disputed but supportable allegations of fact. *See Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016) ("[W]hat are considered the 'facts' [at summary judgment] may not turn out to be the 'actual' facts if the case goes to trial.").

In addition to the intermittency problem, the PNMMs could not at any time meet the critical RSIP specification of -158 dBc at 500 KHz. While the units had difficulty with inconsistency at virtually all of the RSIP parameters, that particular parameter became impossible for the units to meet. ATTI identified component degradation as the primary source of the failures but also noted problems with the synthesizer, phase lock loop section, and software.

When ATTI delivered the PNC to the Air Force in March 2007, ATTI informed the Air Force that the PNMMs did not meet RSIP specifications. ATTI represented that the PNMMs "will only perform, marginally and intermittently, and only after a major overhaul." ATTI told the Air Force that ATTI had looked into replacing various components but found that "[a]ll the stocks on piece parts and subassemblies [had] been depleted, and key vendors [were] no longer viable." ATTI recommended that the Air Force purchase from ATTI "a form/function replacement" that ATTI would design and manufacture. In October 2007, ATTI gave the Air Force a white paper detailing the problems with the PNMMs, concluding that the PNMMs were beyond economic repair, and recommending that the Air Force purchase redesigned, replacement PNMMs.

In December 2007, in response to an inquiry regarding alternatives, ATTI presented the Air Force with an analysis of several options, one of which was that the Air Force incorporate into the BRAT a commercially available piece of equipment, the Agilent 5052B Signal Source Analyzer (the Agilent). The Agilent would supplement the PNMMs by measuring the -158 dBc at 500 KHz parameter. ATTI estimated that each of its suggested alternatives would cost approximately $15 million, while purchasing replacement PNMMs would cost approximately $5.5 million. ATTI also emphasized "that the three candidate solutions selected represent the only other alternatives [to the replacement PNMMs] available yet NONE satisfies the AWACS phase noise requirements." [2]

In September 2008, the AWACS program office at Hanscom AFB, Massachusetts ordered three replacement PNMMs using "fallout money" [3] but informed the BRAT program office at Warner–Robins AFB that Warner–Robins AFB would have to procure the additional seven replacement PNMMs the Air Force would require.[4] Although the BRAT program office and ATTI engaged in contract discussions, the Air Force never contracted to purchase the remaining seven replacement PNMMs.

### B. Robert Buckley

Robert Buckley, an engineer who specializes in radar system testing, worked for ATTI from April 1991 to April 2007. During his employment, Buckley was heavily involved in the PNMM project and describes himself as the primary designer of

---

2. During this litigation, counsel for CDI asked ATTI's corporate representative why the Agilent and PNMM would not together meet RSIP specifications. ATTI's corporate representative mentioned other frequencies at which the PNMM was failing and testified that reliability and intermittence issues prevented the PNMMs from meeting specifications at other measurement points.

3. An individual in the AWACS program office described fallout money as "money that was budgeted by somebody for that year and then they could not expend it.... So if somebody has money that's going to expire, they're going to lose it. I have the capability to get it on contract within a short timeframe."

4. The Air Force had ten BRATs and therefore anticipated requiring ten replacement PNMMs.

the PNMM. Buckley and Shahen Minassian, another ATTI engineer, worked together to design the PNC. Buckley and Minassian first discovered the problems with the PNMMs in June 2006. Buckley dedicated himself to resolving the problems until at least January 2007, when he realized that the PNMMs would not meet RSIP specifications. According to Minassian, Buckley told Minassian that the PNMMs "could not be repaired and would require a major redesign to meet RSIP specifications." Buckley was present for ATTI's March 2007 meeting with Air Force personnel at which ATTI first informed the Air Force of the PNMMs' problems. Buckley concurred both in ATTI's conclusion that the PNMMs could not meet RSIP specifications due to component degradation and in ATTI's recommendation that the Air Force purchase replacement PNMMs.

In April 2007, ATTI fired Buckley. A few weeks after his termination, in late April 2007, Buckley accepted a job with CDI, another defense contractor.[5]

### C. CDI Offers to Repair the PNMMs

In October 2008, shortly after Hanscom AFB ordered three replacement PNMMs and one year after ATTI gave the Air Force the white paper, members of the BRAT program office and maintenance personnel at Warner–Robins AFB met to discuss repairability and calibration concerns relating to the PNMMs. By that time, Warner–Robins AFB maintenance personnel were having a difficult time keeping a sufficient number of PNMMs operational. An email summary of the

meeting indicates that the attendees understood ATTI's position to be that it "can no longer support the repair or build [the] same equipment due to interface of old components and newer ones" and that ATTI "propose[d] an updated version at a high cost." The group apparently agreed to "[e]xplore the means for [a] sole source contactor [sic] who can meet the short term goals." Attached to the email was a list of short term goals, the first of which was to "[g]et four (4) of these modules fully operational and calibrated within 90 working days or less, if possible, after contract award." The sixth goal was to "repair all spare modules to a fully functional and calibrated state within 6 months or less after contract award."

According to Buckley, the Air Force first approached him in late October 2008 to ask whether he could provide technical assistance with the PNMMs.[6] In October or November 2008, Buckley responded to the Air Force and indicated that he could "meet the objectives of restoring 4 modules to operational condition in a maximum 90 working days" if certain conditions were met. Buckley was not retained to provide services relating to the PNMMs in 2008 or 2009.

By early 2010, all nine PNMMs at Warner–Robins AFB were nonoperational. In March 2010, two CDI employees spoke about the PNMMs with Jackie Cleghorn, the squadron director for the unit that maintained the BRATs. A written report summarized that meeting as follows:

The main topic of discussion was the BRAT Phase Noise Module and the fact that the AF has only nine of the units

---

5. CDI paid Buckley less than one third of the amount ATTI had been paying him. Buckley later sued ATTI for back pay, and ATTI counter-sued for waste of corporate assets seeking $1.5 million. The parties settled their lawsuit in April 2010.

6. The precise date Buckley began to communicate with the Air Force regarding the PNMMs is relevant to whether Buckley breached an 18–month non-compete provision in his employment agreement. This is not an issue on appeal.

and four are not serviceable. The AF was told by ATTI that they will have to buy new Phase Noise Modules as ATTI will no longer support the older model. . . . During the discussion, Mr. Cleghorn said he would be interested in having Bob Buckley come to the depot and help determine the status of theses [sic] problems. . . . The intent of the visit would be to produce a plan/quote for [CDI] to **repair the defective modules if Bob [Buckley] determines this is possible.**

Later that month, Buckley met with Cleghorn to discuss the PNMMs.

The precise scope of Buckley's task and of Buckley's representations regarding his ability to complete the task is disputed. Buckley represents that (1) Cleghorn asked him to help Air Force personnel repair the PNMMs; (2) he told Cleghorn he could "probably help to get them functioning again;" (3) as a result of his assistance that same day, "technicians were able to get two of the units operational;" and (4) he understood the scope of Cleghorn's request to be that he get the PNMMs to pass their self-test and a limited (non-RSIP) calibration program. According to Cleghorn, however, Buckley was hired to fix the PNMMs to make them both operational and fully calibrated. Although Cleghorn was unaware of RSIP, he was not interested in having partially calibrated PNMMs. According to Cleghorn, had Buckley told him that the PNMMs could not be made to be both operational and calibrated, he "would have thrown [Buckley] out right then." Although Cleghorn was unaware of RSIP, other Air Force personnel testified that they understood Buckley to have represented that he could fix the PNMMs to make them calibrated in compliance with RSIP specifications.

In April 2010, Cleghorn signed off on a budget authorization form to have Buckley repair the nine PNMMs at Warner–Robins AFB. Air Force personnel from the BRAT program office, the maintenance units, and the calibration group, all testified that they understood Buckley's job to be to repair the PNMMs to make them calibrated to RSIP specifications and certified for operational use.[7] In May 2010, Buckley began to work on the PNMMs. On July 14, 2010, Buckley emailed two Air Force maintenance personnel and represented that he had repaired eight of the nine PNMMs "other than going through the Path 1 Calibration." Buckley claimed to be waiting for parts to complete the "last hardware repair" of the final PNMM.

In August 2010, the Air Force authorized a contract for CDI to develop a calibration program for the PNC. The budget authorization form stated that Warner–Robins AFB has "9 [PNMMs] that CDI has repaired under an existing Navy contract . . . that require[ ] calibration. . . . This [PNC] is required to calibrate our [PNMMs] in the BRAT testers." After a November 2010 meeting, James Annis, the BRAT program manager, emailed the attendees (including Buckley and other CDI employees) a recap noting "[i]n simple terms, CDI is under contract by [Warner–Robins AFB] to . . . [r]estore Phase Noise Measurement Modules (PNMM) to pass calibration."

Buckley originally projected that he would complete the PNC calibration program in January 2011. Buckley claims to have completed the manual calibration for the PNC in April 2011 but never completed an automated calibration process for the PNC due to "an interruption of Air

---

**7.** At least one witness distinguished between the initial repair job and the follow-on calibration job but agreed that calibration was necessary for the PNMMs to be working.

Force funding." In a declaration to the district court, Buckley claims that "[a]s a result of [his] technical assistance, the Air Force technicians were successful in getting the PNMMs to pass their self-test and to pass the PNC calibration program that the Air Force had previously accepted." According to an Air Force witness, the PNMMs have not been calibrated to RSIP specifications since 2007.

## D. The Air Force Decides Not to Purchase Replacement PNMMs

ATTI claims it did not know until after mid–2010 that Buckley was providing services relating to the PNMMs. Throughout 2009 and 2010, ATTI and the Air Force were negotiating the sale of the remaining seven replacement PNMMs. In October 2010, ATTI provided Annis a confidential report detailing ATTI's testing of the PNMMs and purportedly showing "instability in the existing PNMM" that was "masked by the elevated noise floor of the ... PNC ... across all frequencies of interest." In a November 2010 meeting to discuss the report, ATTI informed Air Force personnel that the replacement PNMMs "fully satisfy the technical requirements necessary to support the AWACS RSIP maintenance production," that "[t]he existing obsolete modules do not," and that "the existing obsolete modules [are] unreliable after repair and are a technical and cost risk long term."

In June 2011, Annis sent an email to other Air Force personnel, in which he wrote that "ATTI met with my leadership last week" and has "determined that the present PNMM can't be calibrated to RSIP standard[s]." Three minutes later, Adam Saunders, a Warner–Robins AFB technician, replied stating "I thought [Buckley] determined that [CDI] is able to calibrate to RSIP standards with the current effort we have going with [CDI]." On June 13, 2011, Saunders sent an email to Buckley asking "Bob, is the PNC being calibrated to RSIP standards? Will this calibrator be able to validate the [PNMMs] to RSIP standards?" That same day, Buckley responded as follows:

> Yes, we fixed errors in the AFMETCAL TO (which everyone agreed had an error in the additive phase noise floor) and we are calibrating the PNC to RSIP standards. If you look at the document I sent you, you will see the levels in the table and the graphs showing that we are properly calibrating the unit.... If you have the calibration document that I sent with the test method you will see everything is tested to RSIP specs.

On June 16, 2011, Air Force personnel met to discuss ATTI's contention that the PNMMs could not meet RSIP specifications. Annis's notes from the meeting indicate that the "group consensus" was to "continue and complete calibration efforts on [the] old PNMM configuration."

On July 25, 2011, Annis wrote an email to numerous Air Force maintenance personnel noting ATTI's "rationale" that without replacement PNMMs, the Air Force "will not be able to test to the RSIP standards," and concluding that "[d]ue to the contract efforts accomplished by CDI over the last year and [a] half, the [Warner–Robins AFB] personnel do not believe it is in the government[']s best interest to implement the [BRAT] 303C modification accomplished by ATTI." In October 2011, an Air Force engineer created an "Analysis and Decision Recommendation," which examined the pros and cons of continuing to use the old PNMMs versus purchasing and implementing the replacement PNMMs. One pro of continuing to use the old PNMMs was that the Warner–Robins AFB maintenance group "has already paid a contractor to repair all of their old modules and to develop an organic calibration

capability."[8] One con of continuing to use the old PNMMs was their inability to meet the -158dBc at 500kHz parameter, but the engineer noted that there was a "procedural work[ ]around ... using a[n] Agilent E5052B Signal Source Analyzer to perform those tests." The engineer recommended continuing to use the old PNMMs, because "combined with the test procedure workarounds, [the existing BRAT] will support [AWACS] UUT requirements" and "with spares and available repair support, [the old PNMMs] can be kept operational for at least another 5 to 10 years."

In November 2011, the Air Force notified ATTI that the Air Force "will not require ATTI to complete the remaining services under the terms of the contract." In mid–2012, the Air Force ceased funding Buckley's efforts, and Buckley stopped working on the PNC and PNMMs without having completed the project. The PNMMs have not been calibrated to RSIP specifications since 2007. The three replacement PNMMs that the Air Force purchased for $2.3 million were shipped to Warner–Robins AFB but have never been used.

## II. DISCUSSION

### A. ATTI Did Not Waive the Intermittency Issue

ATTI did not waive the intermittency issue by failing to properly raise it in the district court. ATTI based its theory of liability upon Buckley's alleged misrepresentation of his ability to fix the PNMMs to make them operational and calibrated. When CDI moved for summary judgment, ATTI responded by identifying with specificity the two allegedly unsolvable problems with the PNMMs: (1) the failure to test out to the -158dBc at 500 kHz noise floor (the "158 issue"); and (2) the intermittency issue. In its response to CDI's motion for summary judgment, ATTI referred to "intermittency" and "instability" at least four times each. ATTI's statement of undisputed facts also includes at least four paragraphs discussing the intermittency issue. In the record evidence cited in support of ATTI's statement of undisputed facts, I find at least seven direct references to the intermittency issue. At the telephone conference the district court scheduled to discuss the 158 issue, counsel for ATTI reminded the district court that the 158 issue was not dispositive of ATTI's claims, stating that the 158 issue "doesn't go to the basic problem which is the instability of the PNMMs anyways." Following up on the telephone conference, counsel for ATTI wrote a letter in which he again discussed the intermittency issue.

Thus, contrary to the majority's suggestion, ATTI strenuously asserted the intermittency issue before the district court. In fact, the district court addressed the intermittency issue, concluding not that ATTI waived the intermittency issue but that ATTI failed to establish a genuine issue of material fact as to the issue (a conclusion with which I disagree). The district court's emphasis on the 158 issue and misunderstanding of the intermittency issue constitutes not ATTI's waiver but the district court's reversible error.

### B. Genuine Issues of Material Fact Remain

Genuine issues of material fact remain as to (1) whether Buckley misrepresented his ability to resolve the "intermittency issue," i.e., the inability of the PNMMs to keep calibration because of component degradation; and (2) whether Buckley's misrepresentations regarding the intermit-

8. Organic calibration refers to the ability of Warner–Robins AFB personnel to calibrate

the PNMMs themselves, without shipping the PNMMs to ATTI.

tency issue induced the Air Force to not do business with ATTI. First,

### 1. Intermittency Issue

ATTI cites sufficient evidence to establish a genuine issue of material fact as to whether Buckley misrepresented his ability to resolve the intermittency issue. *See Culpepper v. Thompson*, 254 Ga.App. 569, 562 S.E.2d 837, 840 (2002) (The wrongful conduct element of tortious interference "involves predatory tactics such as ... fraud or misrepresentation" (quoting *Disaster Servs. v. ERC P'ship*, 228 Ga.App. 739, 492 S.E.2d 526, 529 (1997))). Spinner's declaration discusses the intermittency issue's effect on the PNMMs in 2006 and the issue's contribution to ATTI's conclusion that the PNMMs were no longer mission capable. Spinner also asserts that the Agilent could not cure the intermittency issue and that the intermittency issue prevented the PNMMs from meeting RSIP specifications. Minassian's declaration corroborates much of Spinner's declaration regarding the intermittency issue, stating that Minassian and Buckley observed the issue in 2006, and that the intermittency issue was a basis for their conclusion that the PNMMs needed to be replaced. This is also confirmed by a document from ATTI's March 2007 meeting with the Air Force at which ATTI stated that the PNMMs "will only perform, marginally and intermittently, only after a major overhaul."

In his deposition, Buckley admitted he knew in 2007 that the PNMMs could not reliably test to (and in fact did not meet) RSIP specifications. The depositions of two Air Force personnel confirm Spinner's statement that the PNMMs could not be certified for field use if they failed to comply with all RSIP specifications. Even Buckley testified that the Air Force never relaxed the RSIP specifications (though he insists that the scope of his work was "to use the calibration program that was delivered" with the PNCs in 2007). At least two Air Force witnesses testified that they understood Buckley to have represented that he could fix the PNMMs to make them calibrated in compliance with RSIP specifications. Additionally, in mid–2011, Buckley represented to the Air Force that he was repairing the PNMMs to make them comply with RSIP specifications. In June 2011, Annis sent an email to other Air Force personnel, in which he wrote that "ATTI met with my leadership last week" and has "determined that the present PNMM can't be calibrated to RSIP standard[s]." Three minutes later, Adam Saunders, a Warner–Robins AFB technician, replied stating "I thought [Buckley] determined that [CDI] is able to calibrate to RSIP standards with the current effort we have going with [CDI]." On June 13, 2011, Saunders sent an email to Buckley asking "Bob, is the PNC being calibrated to RSIP standards? Will this calibrator be able to validate the [PNMMs] to RSIP standards?" That same day, Buckley responded as follows:

> Yes, we fixed errors in the AFMETCAL TO (which everyone agreed had an error in the additive phase noise floor) and we are calibrating the PNC to RSIP standards. If you look at the document I sent you, you will see the levels in the table and the graphs showing that we are properly calibrating the unit.... If you have the calibration document that I sent with the test method you will see everything is tested to RSIP specs.

But Buckley never completed his work on the PNMMs, which, according to a witness from the Air Force calibration office, remain uncalibrated to date. According to Spinner, nothing Buckley did to the PNMMs could have resolved the intermittency issue. Thus, ATTI has offered competent evidence that the intermittency issue existed, that Buckley knew the intermittency issue existed, that the

intermittency issue prevented the PNMMs from meeting RSIP, that Buckley knew the intermittency issue prevented the PNMMs from meeting RSIP, and that Buckley knowingly failed to cure the intermittency issue or disclose it to the Air Force. There remains a genuine issue of fact regarding whether, in light of the intermittency issue, Buckley misrepresented his ability to repair the PNMMs to make them both operational and calibrated in compliance with RSIP specifications.

### 2. Inducement

ATTI also cites evidence establishing a genuine issue of material fact as to whether Buckley's misrepresentations regarding the intermittency issue induced the Air Force to not do business with ATTI. See Dalton Diversified, Inc. v. AmSouth Bank, 270 Ga.App. 203, 605 S.E.2d 892, 898 (2004) (explaining that the inducement element of tortious interference requires proof that "the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff." (quoting Blakey v. Victory Equipment Sales, Inc., 259 Ga. App. 34, 576 S.E.2d 288, 292 (2002))). Multiple Air Force personnel testified that they understood CDI's repair-and-calibrate option to be an alternative to purchasing any more replacement PNMMs. In July 2011, James Annis, the BRAT program manager, notified Air Force personnel that "[d]ue to the contract efforts accomplished by CDI over the last year and half [sic], [Warner–Robins AFB] personnel do not believe it is in the government[']s best interest to implement the [PNMM] modification accomplished by ATTI." Finally, the October 2011 "Analysis and Decision Recommendation" directly contrasts the ATTI upgrade option with the CDI repair option. The final recommendation is

that the Air Force continue to use the old PNMMs instead of upgrading, because "combined with the test procedure workarounds, [the existing BRAT] will support [AWACS] UUT requirements" and "with spares and available repair support, [the old PNMMs] can be kept operational for at least another 5 to 10 years." A jury could find that this recommendation relied on Buckley's misrepresentations regarding the PNMMs' ability to meet RSIP.

The fact that there is evidence the Air Force was told that Buckley's repairs would have limitations does not change my conclusion. Drawing inferences in favor of the movant is improper at summary judgment. See Allen v. Bd. of Pub. Educ. for Bibb Cty., 495 F.3d 1306, 1315 (11th Cir. 2007). Here, because ATTI proffered competent evidence that Buckley lied to the Air Force, a jury would be entitled to find that the Air Force was deceived and remained so notwithstanding evidence that ATTI told the Air Force that the existing PNMMs were beyond economic repair. See Potts v. UAP–GA AG CHEM, Inc., 256 Ga.App. 153, 567 S.E.2d 316, 320 (2002) ("The fact that [somebody] tells the person that the misrepresentation is false is simply one factor in determining whether that person reasonably relied upon the misrepresentation."); cf. Grant v. Aulicky, 161 Ga.App. 817, 290 S.E.2d 107, 109 (1982) (reversing summary judgment when fraud plaintiff had contradictory information because the defendant induced the plaintiff not to investigate). Nor am I persuaded by the fact that cost factored heavily in the Air Force's decision not to buy the replacement PNMMs. The Air Force may have preferred the less-expensive alternative, but there is evidence that the Air Force would not have considered Buckley's repairs to be an option were it not for Buckley's allegedly false representations that he could make the PNMMs operation-

al and calibrated. In fact, one Air Force witness said that if he had known Buckley could not repair the PNMMs to make them both operational and calibrated, he would have thrown Buckley out of his office. At best, the Air Force's interest in cheap alternatives creates a jury question regarding causation and damages.

The majority also emphasizes that nobody in the Air Force appears to believe Buckley defrauded them. This may be a convincing argument to a jury, but the evidence permits the opposite conclusion. The record contains numerous references to Buckley's alleged representations that the PNMMs either were or could be operational and in compliance with RSIP specifications. The record also contains competent evidence that the PNMMs were not operational, did not comply with RSIP specifications, and could never be fixed to comply with RSIP specifications. The opinions of Air Force personnel, while relevant, are not dispositive on summary judgment.[9]

### III. CONCLUSION

Although I agree with the district court that it is undisputed that Buckley disclosed the 158 issue to the Air Force and suggested a workaround, I disagree that this undisputed fact entitles CDI to judgment as a matter of law. ATTI did not waive and in fact strenuously asserted the intermittency issue before the district court. Notwithstanding our personal opinions of ATTI's likelihood of success, ATTI has proffered summary judgment evidence sufficient to create a genuine dispute regarding whether Buckley's misrepresentation induced the Air Force to discontinue its purchase of replacement PNMMs from ATTI. Be-

cause ATTI has established a genuine dispute of material fact as to each element of its claims for tortious interference with business relationship and tortious interference with prospective business relationship, I respectfully dissent.

---

9. CDI argues "[i]n order to prevail here, ATTI presumably would have to prove that the Air Force is so incompetent that they did not and still do not realize that Mr. Buckley hood-winked them." This may be true, but try as I might, I cannot say that the Air Force is competent as a matter of law. Credibility determinations are for the trier of fact.